OPINION
{¶ 1} Defendant-appellant, Donald E. Jones, was indicted on one count of aggravated robbery and two counts of aggravated murder. After a jury trial, appellant was found guilty of one count of aggravated robbery, one count of aggravated murder and one count of involuntary manslaughter. Appellant was sentenced to a term of incarceration of 28 years to life. Appellant filed a notice of appeal and raises the following assignments of error:
I. The trial court erred and deprived appellant of due process of law as guaranteed by the fourteenth amendment to the united states constitution and article one section ten of the ohio constitution by finding appellant guilty of aggravated murder and involuntary manslaughter as those verdicts were not supported by sufficient evidence and was also against the manifest weight of the evidence.
II. The trial court erred to the prejudice of the appellant by improperly sentencing him to consecutive terms of actual incarceration in contravention of ohio's sentencing statutes.
III. The trial court erred to the prejudice of the appellant by improperly sentencing him to a term of actual incarceration which was longer than the minimum term in contravention of ohio's sentencing laws.
 {¶ 2} The charges against appellant arose out of events that occurred in the early morning hours of July 28, 2002. Michael Jones, appellant's son, testified that, in July 2002, he was selling crack cocaine. On July 28, 2002, Michael and his girlfriend, Melanie Spears ("Melanie"), were making drug deliveries when he received a telephone call from his father, appellant Donald E. Jones, at approximately 2:00-2:30 in the morning. Appellant wanted Michael to meet him and decedent, Guy Justice ("Justice"), at Doug's Bar and rob Justice, because Justice owed appellant $60. Michael told Melanie to drive to Doug's Bar, but decided he did not want to rob Justice so they did not stop. Appellant again called Michael and told Michael to meet him at the house of Andra Wright ("Andra"), appellant's sister, in approximately 15-20 minutes to rob Justice. Michael stated that he went to Andra's house with the intention of robbing Justice. When they arrived at Andra's house, Justice had a gun he was showing people. Michael went upstairs to use cocaine and, when he returned, Justice told him he wanted to talk to him and called him outside. Michael had a feeling about it so he took some of the other occupants outside with him. As they were walking through the kitchen, appellant asked Michael:" What's up, is it still going down?" (Tr. at 366.) Michael testified that he was bothered that appellant still wanted him to rob Justice when Justice was carrying a gun.
 {¶ 3} Michael sat next to Justice and Justice told him that he, Justice, could kill Michael and Jeffrey, Justice's nephew, because they had so many enemies no one would know who had killed them. Justice grabbed his gun and Michael grabbed his arm in an effort to prevent him from cocking the gun. Michael struck Justice in the face with his gun. They struggled for approximately a minute or a minute and one-half and then Michael shot him in the chest. During the struggle, appellant shouted: "Shoot that motherfucker, it's either you or him, you better shoot that motherfucker." (Tr. at 370.) Michael testified that he was in shock and started crying, and Melanie and appellant were urging him to leave. Appellant took Justice's gun. After returning to their hotel room, Melanie and Michael met his family and left town for 11 days until he was arrested and brought back to Columbus.
 {¶ 4} Michael testified that appellant wrote him many letters while they were both imprisoned. In the letters, appellant encouraged Michael to continue to assert his self-defense claim. On cross-examination, Michael stated that he believed that Justice would have shot him if able and he had told the police it was an act of self-defense before appellant had written any letters.
 {¶ 5} Andra testified that appellant's son, Michael, along with Melanie, came to her house and Michael wanted her to call Justice to have him come to her house so Michael could rob him. Michael wanted the meeting with Justice but wanted Andra to set it up because Justice would not meet with Michael. Andra told Michael she did not want to be involved, and Michael and Melanie left. Later that evening, Justice, appellant and appellant's girlfriend, Charlena Robinson, arrived at Andra's house. Justice had a new gun when he arrived and was showing it to people. Soon, Michael and Melanie returned and everyone was ingesting drugs and/or alcohol. Andra went upstairs to use some crack cocaine and, when she returned, everyone, except her boyfriend, Frank, had gone outside to the back porch and was smoking a blunt, a large marijuana cigarette wrapped in tobacco paper. Andra and appellant had an argument and she went back into the house and slammed the door. As she was going upstairs, she looked through the door and saw Michael put a gun against Justice's neck and she continued going upstairs to call the police. While she was looking for her telephone, she heard a male voice that sounded like appellant, say: "Pop him," and then she heard a gunshot. (Tr. at 131.) She called 911.
 {¶ 6} Frank Bowman, Andra's boyfriend, also testified at the trial. He stated that Michael and Melanie had been at the apartment earlier, but left to go to a hotel for the evening. Justice, appellant, and Charlena came to Andra's because Justice had some cocaine he wanted Andra to try. Justice had a gun with him that evening. Michael and Melanie arrived approximately one-half hour to an hour later. At one point, Justice pointed his gun at Frank and Frank went upstairs because he had recently been shot. When he came downstairs again, everyone was outside in the back so he went back upstairs. As he did so, he heard Andra yelling at appellant. Andra then came upstairs and approximately two minutes later, he heard a gunshot.
 {¶ 7} Melanie also testified at the trial. She stated that she and Michael planned to spend the night in a hotel room. They stopped at Andra's apartment to get some clothes because they had been living there. On their way back to the hotel, appellant called Michael and they returned to Andra's to smoke marijuana and have a few drinks. When they arrived, appellant, Justice and Charlena were there. She went upstairs to use the restroom and, when she returned, everyone was outside. She sat next to Justice and, after a couple minutes, saw Michael pull out a gun and hit Justice in the face with it. Michael attempted to prevent Justice from retrieving his gun from his pocket. Michael told Justice to empty his pockets and Justice refused. There was some pushing between the two, and Michael stated:" Yeah, you're going to give me all your money." (Tr. at 240.) Appellant stated: "Shoot him, * * * shoot him. It's either him or you. Shoot him." (Tr. at 240.) At that point, Michael put the gun to Justice's chest and pulled the trigger.
 {¶ 8} Melanie testified that, after the shooting, Michael forced her to drive away. After just a few blocks, she stopped the car and let appellant and Charlena out. They later met some of Michael's family members and left the city. She was forced, against her will, to remain in St. Louis, Missouri, until she was able to escape on August 8, call the police and ride a bus back to Columbus.
 {¶ 9} The coroner testified that Justice died from a gunshot wound to the torso with perforation of the left lung and the pulmonary artery and the aorta. The homicide detective testified that Andra was identified as the 911 caller, Charlena's purse was found in the back seat of Justice's car, and approximately $2,000 in cash and crack cocaine was found on the victim.
 {¶ 10} Appellant was found guilty of aggravated murder and involuntary manslaughter. R.C. 2903.01 provides as follows:
(B) No person shall purposely cause the death of another * * * while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit kidnapping, rape, aggravated arson, arson, aggravated robbery, robbery, aggravated burglary, burglary, terrorism, or escape.
 {¶ 11} R.C. 2903.02 provides that: "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit * * * a felony." The state proceeded against appellant on a complicity theory on all counts. R.C. 2923.03(A) provides that: "No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following: (1) Solicit or procure another to commit the offense; (2) Aid or abet another in committing the offense." In the syllabus of State v. Johnson (2001), 93 Ohio St.3d 240, the court stated:
To support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime.
 {¶ 12} "`Participation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed.'" Johnson, at 245, quoting State v.Pruett (1971), 28 Ohio App.2d 29, 34.
 {¶ 13} By the first assignment of error, appellant contends that the trial court erred by finding appellant guilty of aggravated murder and involuntary manslaughter, because those verdicts were not supported by sufficient evidence and were also against the manifest weight of the evidence. The standard of review for sufficiency of the evidence is if, while viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Jenks
(1991), 61 Ohio St.3d 259, paragraph two of the syllabus. "In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law."State v. Thompkins (1997), 78 Ohio St.3d 380, 386.
 {¶ 14} The test for determining whether a conviction is against the manifest weight of the evidence differs somewhat from the test as to whether there is sufficient evidence to support the conviction. With respect to manifest weight, the evidence is not construed most strongly in favor of the prosecution, but the court engages in a limited weighing of the evidence to determine whether there is sufficient competent, credible evidence which could convince a reasonable trier of fact of appellant's guilt beyond a reasonable doubt. See State v. Conley (Dec. 16, 1993), Franklin App. No. 93AP-387.
* * * Weight of the evidence concerns "the inclination of thegreater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credibleevidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on itseffect in inducing belief." (Emphasis added.) Black's [Law Dictionary (6th Ed. 1990)] at 1594). Thompkins, at 387.
 {¶ 15} Appellant argues that his conviction as a complicitor to Michael is not supported by the sufficiency or weight of the evidence. Appellant argues that appellant's words of encouragement to kill Justice could have had no effect on Michael because Michael believed he was acting in self-defense. Also, appellant contends that appellant and Michael did not share the same criminal intent, because appellant wanted Michael to kill Justice and Michael intended only to defend himself.
 {¶ 16} The situation did not entitle Michael to claim self-defense and appellant cannot benefit from that claim because Michael did not meet the three criteria pursuant to the second paragraph of the syllabus of State v. Robbins (1979),58 Ohio St.2d 74. In Robbins, the Supreme Court of Ohio stated that, to establish self-defense, the defendant must demonstrate that: (1) he was not at fault in creating the situation giving rise to the affray; (2) he had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) he must not have violated any duty to retreat or avoid the danger.
 {¶ 17} In this case, Michael helped escalate the situation by striking Justice in the face with his gun. He, as well, violated his duty to retreat or avoid the danger. Thus, Michael could not have claimed self-defense as an affirmative defense, and appellant could not benefit from the belief that he was aiding Michael in the exercise of his right to self-defense. The jury was entitled to believe the state's evidence that Michael claimed self-defense only after appellant wrote him letters while the two were incarcerated.
 {¶ 18} Appellant contends that appellant and Michael did not share the same criminal intent; however, the evidence supports a finding they did. Appellant wanted Michael to rob Justice and made several phone calls to request that he do so. Appellant also asked Michael, while in Andra's kitchen, if he was still planning on completing the robbery. Michael testified that he changed his mind when he saw that Justice was carrying a gun, yet he hit Justice in the face with his gun and prevented him from cocking his own gun. During the struggle, appellant shouted:" Shoot that motherfucker, it's either you or him, you better shoot that motherfucker." (Tr. at 370.) Melanie testified that she heard Michael say: "Yeah, you're going to give me all your money." (Tr. at 240.) Appellant stated: "Shoot him, * * * shoot him. It's either him or you. Shoot him." (Tr. at 240.) Andra testified that she heard a male voice that sounded like appellant say: "Pop him," and then she heard a gunshot. (Tr. at 131.) Appellant encouraged Michael to leave after the shooting and appellant also took Justice's gun. Appellant, Michael, Melanie and Charlena fled in one car. Appellant also wrote letters to Michael while they were incarcerated and encouraged him to claim self-defense.
 {¶ 19} Appellant's conduct, presence and companionship before, during and after the shooting provides evidence that any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. There is sufficient competent, credible evidence which could convince a reasonable trier of fact of appellant's guilt beyond a reasonable doubt. Appellant's first assignment of error is not well taken.
 {¶ 20} By the second assignment of error, appellant contends that the trial court improperly sentenced him to consecutive terms of actual incarceration in contravention of Ohio's sentencing statutes. By the third assignment of error, appellant contends that the trial court erred by improperly sentencing him to a term of actual incarceration which was longer than the minimum term in contravention of Ohio's sentencing laws. Appellee concedes that the trial court did not make the required statutory findings for imposing consecutive and minimum sentences. Appellant's second and third assignments of error are sustained.
 {¶ 21} For the foregoing reasons, appellant's first assignment of error is overruled, the second and third assignments of error are sustained, and the judgment of the Franklin County Court of Common Pleas is affirmed in part and reversed in part, and this cause is remanded to that court for resentencing.
Judgment affirmed in part, reversed in part and cause remanded.
Brown and Sadler, JJ., concur.