[This decision has been published in *Ohio Official Reports* at 93 Ohio St.3d 240.]

THE STATE OF OHIO, APPELLANT, *v*. JOHNSON, APPELLEE.

[Cite as *State v. Johnson*, 2001-Ohio-1336.]

*Criminal law—Evidence required to support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2).*

(No. 00-1219—Submitted May 16, 2001—Decided September 26, 2001.)

APPEAL from the Court of Appeals for Mahoning County, No. 96 C.A. 190.

_____

SYLLABUS OF THE COURT

To support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime.

_____

LUNDBERG STRATTON, J.

{¶ 1} On June 10, 1996, members of the street gang known as the Bloods opened fire on members of another gang, the Crips. Edward McGaha, a member of the Crips, was wounded. Defendant-appellee, Leslie Johnson, also a Crips member, was present during the attack. One of the primary shooters in the attack was Richard Miles ("Boom"), a Bloods gang member and crack dealer.

{¶ 2} Later that day, McGaha returned home from the hospital and was sitting on the front porch of his mother's home with some other Crips gang members and associates, including defendant, when a carload of Bloods pulled up and opened fire a second time. The Crips returned fire, but no one was injured in the exchange.

**{¶ 3}** After the second exchange of gunfire, defendant, McGaha, Antwan Jones, Neil Bunkley, and Denicholas Stoutmire drove over to the house of a fellow Crips member known only as Heavy. At Heavy's, the group drank beer, smoked marijuana, and talked about how McGaha almost lost his life. According to McGaha, the group talked about going to "get them," and "everybody was just down with me." Neil Bunkley was so angry about the shooting that he punched out a window afterwards. The group decided to go after Boom for his involvement in the McGaha shooting.

**{¶ 4}** Some of the Crips gang members stole two cars and they borrowed a third car from a "feener," a person who uses drugs. Around 12:30 a.m., a group of gang members, including defendant, got into the three cars and left Heavy's house. McGaha and Bunkley were in the stolen black Buick, and McGaha had a sawed-off shotgun. Gary Drayton and Antwan Jones were in a Chevette, and Drayton had a .380 gun. Denicholas Stoutmire was driving the stolen Bonneville, with Damian Williams, who had a .45 automatic, in the passenger seat, and defendant and Sidney Cornwell in the backseat. According to Bunkley, defendant was in possession of a .380 gun earlier that day. The passengers of the three cars were looking for Boom. They planned to shoot him if they found him.

**{¶ 5}** First, the caravan drove to the south side of town, known to be Bloods territory. After splitting up briefly, the cars later met on Edwards Street on the south side of town. The cars then drove around and stopped on South Avenue, where Cornwell and defendant got out of the Bonneville to get a lighter from Jones. Defendant and Cornwell then got back in the Bonneville and decided to go back to Heavy's.

**{¶ 6}** However, rather than going back to Heavy's, the lead car, the Bonneville, pulled up at Oak Park, an apartment complex that Boom was known to frequent. The caravan pulled up side by side in front of the apartments and the occupants discussed kicking down the apartment door to go in and look for Boom.

2

McGaha testified that they planned to kill Boom if they found him. Williams testified that he told the group that kicking in the door was a bad idea because one of them might get shot. Williams also testified that the group got together to go find and kill Boom and that Cornwell was "getting angrier and angrier." Williams testified that "common sense" told them what they needed to do.

{¶ 7} The caravan of cars pulled around to the back of the apartments. Both the Buick and the Chevette drove past the back of the apartment, but the Bonneville stopped behind the apartment. Although the lighting was dim, McGaha testified that he was able to see a female and a male on the porch.

{¶ 8} Susan Hamlett, a resident of the apartment complex, and Donald Meadows, her date, were on the back porch at 2:20 a.m. when Hamlett's three-year-old niece, Jessica Ballew, came out on the porch, wanting a drink of water. Hamlett was on her way back into the apartment with Jessica when the three cars came up the alley behind the apartment building.

{¶ 9} Hamlett could see four people in the Bonneville. Cornwell asked if Boom was at the apartment. When Hamlett and Meadows replied that Boom was not at the apartment, Cornwell asked again, "Where is Boom?" Hamlett replied, "He don't live here." Cornwell said, "Well, tell Boom this," and he opened fire. Samuel Lagese and Marilyn Conrad, who were inside the apartment, and Meadows were struck and wounded. Three-year-old Jessica Ballew was killed.[1]

{¶ 10} A jury convicted defendant of one count of complicity to commit aggravated murder, in violation of R.C. 2923.03(A)(2) and 2903.01(A), and three counts of complicity to commit attempted aggravated murder, in violation of R.C. 2923.03(A)(2), 2923.02(A), and 2903.01(A). In addition, each count carried a firearm specification pursuant to R.C. 2941.141 and former 2929.71(A), now R.C. 2929.14. The Court of Appeals for Mahoning County relied on *State v. Sims*

---

1. Sidney Cornwell, the triggerman, was sentenced to death. His conviction and sentence were upheld by this court in *State v. Cornwell* (1999), 86 Ohio St.3d 560, 715 N.E.2d 1144.

(1983), 10 Ohio App.3d 56, 10 OBR 65, 460 N.E.2d 672, and reversed the convictions and discharged the defendant.

{¶ 11} The cause is now before this court upon the allowance of a discretionary appeal.

{¶ 12} The issue before the court today is whether the actions of the defendant constituted complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2). We find that they do, and for the reasons that follow, we reverse the judgment of the court of appeals and reinstate the defendant's convictions and sentence.

{¶ 13} Defendant was convicted of complicity to commit aggravated murder, a violation of R.C. 2923.03(A)(2) and 2903.01(A), for the killing of Jessica Ballew. R.C. 2923.03 provides:

"(A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:

"* * *

"(2) Aid or abet another in committing the offense."

{¶ 14} R.C. 2903.01(A) provides a definition of aggravated murder:

"No person shall purposely, and with prior calculation and design, cause the death of another * * *."

{¶ 15} With regard to the three other victims of these crimes, defendant was charged with and convicted of complicity to commit attempted aggravated murder, in violation of R.C. 2923.03(A)(2), 2903.01(A), and 2923.02(A).

{¶ 16} R.C. 2923.02(A) provides a definition of attempt:

"No person, purposefully or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense."

{¶ 17} Ohio's complicity statute, R.C. 2923.03, does not provide a definition of the terms "aid or abet." As a result, this court is now called upon to

provide a definition. Black's Law Dictionary defines "aid and abet" as "[t]o assist or facilitate the commission of a crime, or to promote its accomplishment." Black's Law Dictionary (7 Ed.Rev.1999) 69.

{¶ 18} This court has held that "the mere presence of an accused at the scene of a crime is not sufficient to prove, in and of itself, that the accused was an aider and abettor." *State v. Widner* (1982), 69 Ohio St.2d 267, 269, 23 O.O.3d 265, 266, 431 N.E.2d 1025, 1027. This rule is to protect innocent bystanders who have no connection to the crime other than simply being present at the time of its commission.

{¶ 19} We find, however, on these facts, much more than "mere presence" and we find that the court of appeals misapplied this legal concept. The court of appeals relied heavily on a case that is often cited by other appellate courts and defines "aider and abettor" as "one who assists or encourages another to commit a crime, and participates in the commission thereof by some act, deed, word, or gesture." *State v. Sims* (1983), 10 Ohio App.3d 56, 10 OBR 65, 460 N.E.2d 672, paragraph two of the syllabus. *Sims* held that "[a] person cannot be convicted of aiding and abetting a principal offender in the commission of an offense in the absence of evidence that the person assisted, incited or encouraged the principal to commit the offense." *Id.*, paragraph three of the syllabus.

{¶ 20} Of course, *Sims* is not controlling legal authority. It is also distinguishable. In *Sims*, the defendant, who was convicted of aiding and abetting receiving stolen property and aiding and abetting possession of criminal tools, was a passenger in the back seat of a stolen car being driven by another male who was the apparent thief. The only evidence adduced indicated that Sims was " 'associated' with Sanders [the principal], in that he was a passenger in the car with Sanders for about thirty seconds when he and his women companions were ordered out of the car by police." *Id.* at 59, 10 OBR at 69, 460 N.E.2d at 676.

**{¶ 21}** This case is clearly distinguishable from *Sims*. The prosecution in *Sims* obviously failed to prove that the defendant was anything more than merely present at the scene of the crime. Defendant in this case was a member of the Crips gang. Based on the record, which chronicles three separate gang-related shootings in a twenty-four-hour period, violence and revenge were a way of life for these rival gang members. Defendant went along on that fateful night as protection and support for his fellow gang members who had recently been "disrespected." He also had his own reason for revenge, as he himself had been shot at earlier that day.

**{¶ 22}** Defendant was present when the Bloods shot at defendant, McGaha, and other Crips earlier in the day, wounding McGaha. Williams testified that he was driving around when he saw McGaha lying in the driveway, looking "almost dead." Williams testified that he talked with defendant at the scene and defendant told him that Boom had shot McGaha.

**{¶ 23}** Defendant was present at the home of McGaha's mother later that afternoon when the Bloods shot at the Crips a second time. Defendant was present at Heavy's house when the Crips got together to discuss the prior shootings. Defendant was present when the group decided to "go get" Boom.

**{¶ 24}** After other Crips members and associates went out and stole two cars to use in their plan to get Boom, defendant got into one of the stolen cars and rode around town in areas known to be frequented by rival Bloods gang members for over an hour looking for Boom. At one point during the evening, the cars converged, and defendant got out of the stolen Bonneville to get a light for his cigarette. Defendant could have abandoned the plan to kill Boom at that point or several other points throughout the day and night, but he did not. Instead, he chose to continue on with the three-car caravan in search of Boom so that the gang could seek revenge on Boom, their rival. As McGaha testified, "Everybody was just down with me."

6

{¶ 25} Defendant was in the lead stolen car when the caravan pulled up in front of the Oak Park apartment, known to be frequented by Boom. Although no one told Stoutmire where to go on Oak Park, Williams agreed that Stoutmire knew where he was going, since they were looking for Boom and intended to shoot him if they found him. The gang members discussed the best way to enter the apartment in order to kill Boom. Williams testified about talk of kicking the door down to go in after Boom, but Williams testified that he told the gang that he thought that that was a bad idea. Again, defendant was reassured that a murder was about to take place, and he yet he failed to renounce or abandon the plan.

{¶ 26} Defendant was still present in the stolen Bonneville when it pulled around behind the Oak Park apartment and up to the back porch, where his cohort, Sidney Cornwell, shot and killed three-year-old Jessica Ballew and wounded Meadows, Lagese, and Conrad. After these shootings, defendant and some of his fellow Crips gang members continued to stay together and went into hiding until defendant and others were ultimately arrested and charged with these crimes.

{¶ 27} Defendant would have this court conclude that because no witness pinpointed a specific statement by defendant of his intent to join the plan to kill Boom, there is insufficient evidence to support a conviction for complicity based on aiding and abetting. This position defies not only the law but common sense.

{¶ 28} Accordingly, we find that the court of appeals' decision went astray when it held that although the evidence at trial could reasonably support a finding that defendant was involved in a conspiracy to kill Boom, such a finding was insufficient to support convictions of complicity to commit aggravated murder and attempted aggravated murder based on appellant's alleged aiding and abetting of the principal offender. The court of appeals concluded that had the state elected to charge defendant with complicity based on his involvement in a conspiracy pursuant to R.C. 2923.03(A)(3), it was free to do so. But, by charging defendant solely under R.C. 2923.03(A)(2) as an aider and abettor, the court of appeals found

that the state failed to provide defendant with sufficient legal notice that he could be convicted for the offense based on his role as a conspirator. We disagree and hold that defendant's actions did constitute aiding and abetting as set forth in R.C. 2923.03(A)(2).

{¶ 29} Defendant was not an innocent bystander who was merely along for the ride. In fact, he intended to assist with the murder of Boom. We agree with the proposition that "[p]articipation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed." *State v. Pruett* (1971), 28 Ohio App.2d 29, 34, 57 O.O.2d 38, 41, 273 N.E.2d 884, 887.

{¶ 30} Defendant's cohort, Williams, defined what the gang intended to do not as a plan but as a "common sense" understanding of what needed to be done. When asked why they did what they did, Bunkley responded, "To seek revenge for something that he did to my friend. * * * I mean, he [Boom] tried to kill my friend, so—you know, you bold enough to take a life, you'll get yours, too." When asked whether killing Boom was the plan of all eight people who were at Oak Park that night, Bunkley responded, "There was no plan. We all knew what we had to do. * * * Get rid of Boom. * * * Cause physical harm, kill him, shoot him, whatever you want to call it."

{¶ 31} The fact that defendant did not articulate his intent will not allow him to escape responsibility for his clear actions of complicity by aiding and abetting in the commission of these crimes. Accordingly, we hold that to support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime.

{¶ 32} Defendant and his fellow gang members hatched a calculated plan to kill Boom in order to avenge the shooting of their fellow gang member, McGaha.

Defendant rode in the lead car with the shooter looking for their intended target. Sidney Cornwell and his associates, including defendant, intended to shoot Boom, but they killed Jessica Ballew and injured three others instead, and for those acts defendant is responsible as a complicitor.

{¶ 33} Accordingly, we reverse the judgment of the court of appeals and reinstate defendant's convictions and sentence.

*Judgment reversed.*

MOYER, C.J., DOUGLAS and RESNICK, JJ., concur.

F.E. SWEENEY, PFEIFER and COOK, JJ., dissent.

————————————

**PFEIFER, J., dissenting.**

{¶ 34} This court should have adopted *State v. Sims* (1983), 10 Ohio App.3d 56, 10 OBR 65, 460 N.E.2d 672, as the controlling Ohio authority on what constitutes an aider or abettor. *Sims*, as the majority points out, has been relied upon by other Ohio appellate jurisdictions, and appears to provide a useable definition for a somewhat slippery term. In my mind, the *Sims* definition creates a necessary distinction between an aider or abettor and a conspirator. The *Sims* definition requires participation in the commission of the act rather than in the planning of the act. I agree with the court of appeals that Johnson may well have been guilty of conspiracy, but he was not so charged. Instead, the prosecution overreached and failed to present any evidence of *Sims*-required actual participation. I would affirm the judgment of the appellate court.

F.E. SWEENEY AND COOK, JJ., concur in the foregoing dissenting opinion.

————————————

*Paul J. Gains*, Mahoning County Prosecuting Attorney, and *Janice T. O'Halloran*, Assistant Prosecuting Attorney, for appellant.

*Sherman J. Miles*, for appellee.

————————————