The STATE of OHIO, Appellee,

v.

DUBOSE, Appellant.

[Cite as *State v. Dubose*, 174 Ohio App.3d 637, 2007-Ohio-7217.]

Court of Appeals of Ohio,
Seventh District, Mahoning County.

No. 05 MA 142.

Decided Dec. 31, 2007.

638

Paul J. Gains, Mahoning County Prosecuting Attorney, and Rhys B. Cartwright–Jones, Assistant Prosecuting Attorney, for appellee.

Jennifer L. McLaughlin, for appellant.

WAITE, Judge.

{¶ 1} Appellant, Ceyanie Dubose, was convicted of complicity to murder and an attendant firearm specification following his jury trial in the Mahoning County Court of Common Pleas. He was sentenced to an indefinite term of 15 years to life on the underlying conviction, consecutive to a three-year term on the firearm specification.

{¶ 2} Appellant was indicted along with his cousin, Edward Dubose. The two were to have separate trials. The state's position was that appellant and Edward purposely shot and killed Marcus Bradley during the early morning hours of November 12, 2001. Evidence showed that appellant was present with the victim at the scene of the murder and that appellant was later seen with blood on his clothes. Appellant denied any involvement in the murder and in fact presented evidence that he had spent the night at his girlfriend's apartment at the time of the shooting.

{¶ 3} On appeal, appellant argues that his convictions were not supported by sufficient evidence and that his convictions were against the manifest weight of the evidence. Appellant also argues that he was denied his right to a public trial in violation of the Sixth Amendment and that he was denied his right to a speedy trial. For the following reasons, we conclude that the trial court committed structural error in closing the courtroom in this case, and therefore, appellant is entitled to a new trial.

{¶ 4} For ease of understanding, we address appellant's assigned errors out of sequence. His second and third assignments of error concern the sufficiency and weight of the evidence, and we will deal with them collectively:

{¶ 5} "The state of Ohio failed to introduce sufficient evidence to prove beyond a reasonable doubt that defendant-appellant Ceyanie Dubose purposely or knowingly aided and abetted the principal in the killing of Marcus Bradley, thereby violating Mr. Dubose's due process rights guaranteed by the Fourteenth Amendment to the United States Constitution.

{¶ 6} "The jury verdict finding defendant-appellant Ceyanie Dubose guilty of complicity to murder is against the manifest weight of the evidence in violation of Article IV, § 3(B)(3) of the Ohio Constitution."

{¶ 7} When a defendant claims that his conviction is supported by insufficient evidence, we must review the evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could have found that all the elements of the crime were proven beyond a reasonable doubt. *State v. Eley* (1978), 56 Ohio St.2d 169, 10 O.O.3d 340, 383 N.E.2d 132; *State v. Apanovitch* (1987), 33 Ohio St.3d 19, 23, 514 N.E.2d 394. Whether the state

presented sufficient evidence is a question of law. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541.

{¶ 8} The weight of the evidence, on the other hand, concerns the greater amount of credible evidence offered at trial. When reviewing a claim that a conviction is against the manifest weight of the evidence, the reviewing court must weigh the evidence and the credibility of the witnesses to determine whether the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed. *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717; *Thompkins*, supra. For a court of appeals to reverse on grounds of manifest weight of the evidence, it must unanimously disagree with the jury's resolution of the conflicting testimony. Id.

{¶ 9} Appellant was found guilty of complicity to murder in violation of R.C. 2903.02(A), which states, "No person shall purposely cause the death of another * * *."

{¶ 10} "Purposely" is defined in R.C. 2901.22(A):

{¶ 11} "A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature."

{¶ 12} R.C. 2923.03, forbidding complicity, states:

{¶ 13} "(A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:

{¶ 14} "(1) Solicit or procure another to commit the offense;

{¶ 15} "(2) Aid or abet another in committing the offense;

{¶ 16} "(3) Conspire with another to commit the offense in violation of section 2923.01 of the Revised Code."

{¶ 17} A defendant's " '[p]articipation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed.' " *State v. Johnson* (2001), 93 Ohio St.3d 240, 245, 754 N.E.2d 796, quoting *State v. Pruett* (1971), 28 Ohio App.2d 29, 34, 57 O.O.2d 38, 273 N.E.2d 884. However, mere presence at the scene of a murder is not enough to establish complicity. *State v. Mootispaw* (1996), 110 Ohio App.3d 566, 570, 674 N.E.2d 1222. A defendant must have had some level of participation by way of providing assistance or encouragement. *State v. Nievas* (1997), 121 Ohio App.3d 451, 456, 700 N.E.2d 339; *State v. Sims* (1983), 10 Ohio App.3d 56, 58, 10 OBR 65, 460 N.E.2d 672. Aiding and abetting includes such things as supporting, assisting,

encouraging, cooperating with, advising, or inciting another to commit the underlying offense. *Johnson,* supra.

{¶ 18} Appellant argues that the evidence at his trial was insufficient to establish that he aided or conspired with Edward Dubose to purposely cause the death of Marcus Bradley. Appellant claims that his convictions must be reversed.

{¶ 19} On appeal, we review the evidence and consider appellant's presence and conduct before and after Bradley's death to determine whether the record reflects that he supported, assisted, encouraged, cooperated with, or advised the principal in Bradley's murder. *Johnson,* 93 Ohio St.3d at 245, 754 N.E.2d 796. We conclude that the evidence supporting conviction was far from overwhelming. Nevertheless, based on the law and the record before us, we must conclude that it was sufficient.

{¶ 20} The state's first witness at trial was Shirley Sheeler. On the night of November 11, 2001, Shirley and her husband were watching television in their home on Hoffman Street in Youngstown, Ohio. They heard a noise and looked out the window. Shirley saw a white car that had struck the curb or rail. She also noticed two males walking and laughing alongside the car. One was wearing a blue and gray coat.

{¶ 21} Irvin Sheeler also testified. He recalled hearing a loud noise that night. He looked outside and saw a white Cadillac at the curb. Irvin identified State's Exhibit 18, a photograph of the white Cadillac he saw that night. He then noticed the car slowly roll down the hill. Sometime thereafter he heard gunshots. It was about 1:00 a.m. The Sheelers did not call the police, because they frequently heard gunshots in their neighborhood. Later that same morning, the police knocked on their door investigating a murder.

{¶ 22} Youngstown Police Department Officer Kirt Hileman testified that he found the body of a black male face down on the side of the street.

{¶ 23} Dr. Jesse Giles, the Mahoning County deputy coroner at the time, testified at trial. Giles had performed the autopsy of the victim, Marcus Bradley, a.k.a. Marcus Moore. The victim tested positive for alcohol and marijuana. Giles concluded that Bradley's cause of death was homicide as a result of three gunshot wounds to the left side of his head. Two of the shots were fired with the gun placed against the victim's skull. He also had an abrasion to his forehead. He was wearing a blue and gray coat.

{¶ 24} The state's next witness, Wilson Taylor, initially failed to appear to testify and was eventually arrested in order to secure his testimony. Taylor was in jail on cocaine-trafficking charges in 2003, when he was contacted by the police and first provided information in this case. The prosecutor's office agreed not to

oppose his judicial release in exchange for Taylor's testimony, and he admits that he agreed to testify against Edward and Ceyanie Dubose in exchange for his release from prison.

{¶ 25} Taylor testified that he was with appellant on the night in question and that he and Edward were also friends at the time. Edward picked Taylor up in his Cadillac to drive around and smoke marijuana on the night of November 11, 2001. The two later pulled into a Dubose relative's driveway and fell asleep in the car. Taylor woke up to the sounds of appellant and Marcus Bradley knocking on Edward's car. Taylor identified State's exhibits 18 and 19 as photographs of Edward's Cadillac.

{¶ 26} Taylor said that appellant and Bradley got into the back seat of Edward's car and all four drove off to buy marijuana. About two hours later, they did obtain more marijuana. Taylor was now driving Edward's car, and all four were smoking marijuana. Taylor pulled over to the side of the road so that appellant could urinate in the woods, but he left the car in gear. When Taylor heard a knocking sound on the trunk, Bradley exited the back seat of the car. (Tr. 320, 322, 323, 328.)

{¶ 27} Minutes later, Taylor saw Bradley pointing a gun into the passenger side of the car where Edward was sitting. When Edward grabbed for the gun, Taylor testified, he got out of the car and ran. He said he heard Edward exclaim words to the effect of "Not me. Not me," as the car rolled down the street. (Tr. 328–329.)

{¶ 28} Taylor said he did not see or hear a gun actually fire that night, but he believed that Edward had been killed. (Tr. 352.)

{¶ 29} Taylor claims that later that same morning he called a friend and said, "I think they just killed [Eddie]." (Tr. 331.) To Taylor's surprise, this same friend appeared at Taylor's house with Edward later that morning. The three drove to a house where some Dubose relatives lived on the north side of Youngstown. Appellant was there. Taylor stated that appellant had specks of blood on his t-shirt and that another relative was cleaning appellant's jacket. (Tr. 334–336.)

{¶ 30} Bradley was not there, and Taylor did not hear any discussion as to his whereabouts. Taylor claimed that people at the Dubose residence were teasing him because he ran from Edward's car the previous night. (Tr. 337, 338, 340.)

{¶ 31} The following exchange occurred during Taylor's direct testimony. It included a statement critical to appellant's conviction. The statement was made in direct response to a leading question.

{¶ 32} "Q They were—you're at the house. Were they laughing about how you ran away the way you did?

{¶ 33} "A  Yes, sir.

{¶ 34} "Q  And did they indicate to you whether or not you were in any danger at that time?

{¶ 35} "A  No they didn't.

{¶ 36} "Q  They didn't say anything to you about it wasn't you?

{¶ 37} "A  Yeah, they just said that ain't—

{¶ 38} "[Appellant's counsel]:  Objection, Your Honor, only because we don't know who's talking here.  This is clearly an out-of-court statement.

{¶ 39} "THE COURT:  Clarify who's they.

{¶ 40} "Q  Did Ceyanie say to you it wasn't you;  we wanted that other dude?

{¶ 41} "A  Yes, sir.  Yes, sir."  (Tr. 340.)

{¶ 42} The state's next witness was Bobby Kelly.  Kelly was incarcerated at the Mahoning County jail at the time of his testimony.  He had been charged with murder, but the charge was reduced to involuntary manslaughter once he agreed to testify.  (Tr. 360.)  A plea agreement was apparently reached whereby Kelly was to receive seven years in prison on the reduced charge in exchange for his testimony.  (Tr. 361–362.)

{¶ 43} The record reflects that the courtroom was completely cleared of spectators for Kelly's testimony.  He began his testimony by acknowledging that he talked to detectives only after learning that Edward had already discussed Kelly's involvement in this matter with the police.  Kelly stated that he was angry with Edward for "rat[ting]" on him.  (Tr. 375.)

{¶ 44} Kelly said that during the early morning of November 12, 2001, Edward showed up at Kelly's home.  The two were good friends at the time.  Edward showed Kelly blood on the bottom of his car door.  The two drove to a carwash, where Edward washed the car.  Kelly advised Edward that he should not be driving the car.  (Tr. 363, 366, 370.)

{¶ 45} Detective Sergeant Daryl Martin of the Youngstown Police Department also testified for the state.  In investigating Bradley's death, he spoke with the Sheelers and examined the curb and sidewalk area of Hoffman and Fairview. There were fresh scratch marks on the curb, apparently from the undercarriage of a car.  Martin said he received a tip that the Duboses were involved in the murder.  Thereafter, he saw a car matching Mr. Sheeler's description in front of a Dubose family residence.  The man driving the Cadillac gave Martin permission to inspect the car.  (Tr. 382, 385, 386.)

{¶ 46} Martin described the interior of the car as clean, and he saw no blood or casings inside. An exterior search revealed fresh scratches on the undercarriage. This search occurred on December 3, 2001. (Tr. 387, 389.)

{¶ 47} Martin stated that a .22–caliber pistol was found on the decedent. It appeared to be fully loaded but not recently fired. A spent .380–caliber shell casing was found at the scene near the body. (Tr. 395–396, 399.)

{¶ 48} Martin indicated at trial that he had not determined a motive for Bradley's killing. On cross-examination, however, he said that he spoke with a friend of the victim, Tammy Harris, during his investigation. Harris told Martin that Bradley was known to carry two guns, a .22–caliber and a 9 mm, which was confirmed by another witness. (Tr. 416–417.) Harris also told Martin that on the night of his death, Bradley stated that someone owed him money and that he had both guns on his person. Harris suspected that Bradley was dealing drugs. (Tr. 419.)

{¶ 49} On redirect, Martin testified that he heard that Kelly had sold Edward a .380 weapon about a month before Bradley's death but that Edward planned to sell the gun. (Tr. 430, 433.)

{¶ 50} After the state rested, the trial court denied appellant's motion for acquittal.

{¶ 51} Appellant presented witnesses to buttress his claim that he was not with the victim on the night of the shooting, but was with his girlfriend, instead. His first witness was Angelique McKinney. She confirmed that she was the mother of appellant's son.

{¶ 52} McKinney testified that on the night of November 11, 2001, she called appellant and asked him to bring their son medicine. Appellant arrived at her apartment between 9:30 p.m. and 10:00 p.m. and spent the night there. (Tr. 442–443.)

{¶ 53} McKinney was awakened the next morning by the Liberty Police knocking on her door. They were looking for appellant. She lied and told them he was not there. Upon learning that the police were at McKinney's residence, appellant went outside to talk with them. They wanted to talk with him about Edward. The police were evidently called to the complex because Edward had been sitting in the parking lot in a gray Oldsmobile. The police determined that they had an existing warrant for Edward's arrest, so they took him into custody and towed the car. (Tr. 446.) This arrest was unrelated to the instant matter.

{¶ 54} McKinney testified that Edward was sitting in her parking lot that morning to drive appellant to work at Valley Foods. (Tr. 450.)

{¶ 55} Officer Jim Smith of the Liberty Police Department confirmed that he arrested Edward Dubose on the morning of November 12, 2001, in the apartment complex parking lot. He stated that at approximately 6:00 a.m., appellant was also there. (Tr. 468–469.)

{¶ 56} The state presented the rebuttal testimony of Debbie Leonard, the office manager and administrator of personnel records at Valley Foods. Contrary to McKinney's testimony, she testified that appellant did not work at Valley Foods in 2001. (Tr. 474–476.)

{¶ 57} The evidence in appellant's case was limited. Following trial, many unanswered questions remain in this case. Because we have no evidence as to who actually shot Bradley, there is no real motive for the killing and we are left with several outstanding theories as to how and why Bradley was shot. While we have testimony that appellant was generally at the scene of the murder, it is also unclear exactly where he was at the scene when the actual killing took place, since the testimony indicated that he had gone into a wooded area to relieve himself. Despite these unanswered questions, sufficient evidence was introduced to support appellant's conviction.

{¶ 58} In *State v. Johnson* (2001), 93 Ohio St.3d 240, 754 N.E.2d 796, the defendant was convicted of complicity to aggravated murder, among other charges. In *Johnson*, an innocent bystander was shot and killed as a result of the search for revenge on a rival gang member. On appeal, the conviction was reversed on sufficiency grounds. The Supreme Court, however, held that sufficient evidence to sustain the convictions was apparent in the record even though the record did not contain one clear, definitive act establishing the defendant's intention to join the plan to kill a rival gang member. The Supreme Court held that Johnson aided and abetted the killing based on all of the facts and circumstances surrounding the actual death, including the gang's collective plan to find and kill another intended victim and the facts that the defendant drove around in a three-car caravan for an hour searching for their intended victim, that he was in the car with the shooter who subsequently shot and killed the young girl instead of the intended victim, and that he ultimately went into hiding with the others involved in the plan. Id. at 245–246, 754 N.E.2d 796.

{¶ 59} By contrast, in *State v. Ratkovich*, 7th Dist. No. 02–JE–16, 2003-Ohio-7286, 2003 WL 23167300, we reversed the defendant's conviction of complicity to commit theft. The jury found the defendant not guilty of theft but guilty of complicity. The defendant had driven her son to Circuit City and waited for him in the parking lot with the car running. Her son later ran out of the store after stealing two game systems. He testified that his mother did not know of his plan to steal the merchandise. Instead, he jumped in her car after the fact and told

her to quickly drive him away, which she did, nearly striking the store manager with her car. As she drove, he told her about the theft.

{¶ 60} On appeal, we concluded that although Ratkovich's actions showed terrible judgment, they did not demonstrate that she supported, assisted, encouraged, cooperated with, advised, or incited her son in the commission of the theft. Id. at ¶ 26. The theft was complete when her son exited the store. Thus, Ratkovich could have been convicted of obstruction of justice, but her complicity to theft was not supported by the evidence.

{¶ 61} Turning to the matter before us, Dr. Giles testified that Bradley was murdered by three gunshot wounds to the head. Two of the shots were fired at close range. Wilson Taylor placed appellant at the scene on the night of Bradley's death. Appellant was part of a group riding around and using drugs. Later that same morning, Taylor saw specks of blood on appellant's shirt and watched appellant's cousins clean his jacket. Appellant argues that Taylor's testimony was fabricated in part because he did not mention seeing specks of blood in any of his prior statements and he did not remember what part of the shirt the blood was on or how large it was. However, when asked, Taylor described the specks of blood as large enough to see. (Tr. 347.)

{¶ 62} Taylor also confirmed without objection in response to leading questioning that appellant told him, essentially, that he was not the target of the killing, saying, "[W]e wanted that other dude." Appellant takes issue with the leading nature of this testimony, which was critical to his conviction. However, his counsel did not lodge an objection to this question at trial. Instead, the question was asked following appellant's counsel's prior objection, and the question was evidently presented in this leading manner to develop Taylor's testimony. Evid.R. 611(C). Thus, the failure to object to this question and answer waives this argument on appeal. *State v. Timperio* (1987), 38 Ohio App.3d 156, 158, 528 N.E.2d 594; *State v. Williams* (1977), 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364.

{¶ 63} Finally, Bobby Kelly testified that he saw blood on Edward's car later that same morning. Appellant argues that Kelly initially testified to the contrary and then adjusted his testimony to please the prosecutor. However, a review of his testimony reveals that Kelly did not see the blood on Edward's car until Edward showed it to him.

{¶ 64} Based on the foregoing, we find that a jury could have concluded that appellant purposely aided and abetted in Bradley's murder. If believed, there was evidence that appellant had been part of a group including the victim for some time prior to the murder and was at the scene of the killing, that the victim was last seen pointing a gun at Edward, that appellant was seen later that

morning with blood on his shirt, and that appellant told Kelly something to the effect that "we wanted that other dude," i.e., Bradley—the only other person present. Accordingly, and bearing in mind that cooperation with the underlying crime is part of the definition, we hold that the limited evidence in this case was sufficient to establish appellant's guilt on the charge of complicity to murder and the attendant firearm specification.

{¶ 65} We also hold that appellant's convictions were not against the manifest weight of the evidence. Appellant takes issue with the credibility of Kelly and Taylor's testimony based on the fact that they testified in exchange for leniency in their own criminal cases. However, the jury was fully advised of their agreements in their respective criminal cases and still evidently believed the two.

{¶ 66} The jury, however, evidently did not believe appellant's alibi witness, his girlfriend, McKinney. She admitted in her own testimony that she lied to the Liberty Police about appellant's whereabouts on the morning following the killing. McKinney was also mistaken or lying when she testified that appellant was to be picked up from her apartment on the morning of November 12, 2001, to go to his job at Valley Foods. He was not employed at Valley Foods at that time. Accordingly, we cannot find that the jury clearly lost its way and created a manifest miscarriage of justice warranting reversal.

{¶ 67} Therefore, appellant's second and third assignments of error lack merit and are overruled.

{¶ 68} Appellant's first assignment of error is addressed next. It alleges,

■ {¶ 69} "The trial court denied defendant-appellant Ceyanie Dubose his right to a public trial, guaranteed by the Sixth Amendment to the United States Constitution and Article I, § 10 and § 16 of the Ohio Constitution, when it closed the courtroom during Bobby Kelly's testimony. (Tr. at 358.)"

■■ {¶ 70} "The right to a public trial is a fundamental constitutional guarantee under the Sixth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution. * * * This guarantee is a 'cornerstone of our democracy which should not be circumvented unless there are extreme overriding circumstances.'" *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 49, quoting *State v. Lane* (1979), 60 Ohio St.2d 112, 119, 14 O.O.3d 342, 397 N.E.2d 1338.

■ {¶ 71} Further, the denial of the right to a public trial is a structural error, which affects the framework of trial. Thus, any error is prejudicial to the defendant; the harmless-error analysis is inapplicable. *Drummond*, supra, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, at ¶ 50.

{¶ 72} That said, certain interests essential to the administration of justice still may warrant closure of a courtroom. Although the decision to close a courtroom is within the judge's discretion, a trial may be closed only when deemed absolutely necessary, "and any closure must be narrowly drawn and applied sparingly." Id. at ¶ 51.

{¶ 73} To determine whether courtroom closure is proper, the Sixth Amendment requires application of a four-part test set forth by the United States Supreme Court in *Waller v. Georgia* (1984), 467 U.S. 39, 49–50, 104 S.Ct. 2210, 81 L.Ed.2d 31. *Drummond,* 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, at ¶ 52–54; *State v. Rector,* 7th Dist. No. 01 AP 758, 2003-Ohio-5438, 2003 WL 22331979. First, " 'the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, [second,] the closure must be no broader than necessary to protect that interest, [third,] the trial court must consider reasonable alternatives to closing the proceeding, and [fourth] it must make findings adequate to support the closure.' " *Drummond,* 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, at ¶ 52, quoting *Waller* at 48, 104 S.Ct. 2210, 81 L.Ed.2d 31.

{¶ 74} However, in cases involving only the partial closure of the courtroom, the Supreme Court in *Drummond* has recently indicated that only a "substantial reason," and not an overriding interest, must be present to justify the closure. Id. at ¶ 53.

{¶ 75} With this slight adjustment, the Supreme Court in *Drummond* found that the *Waller* criteria had been satisfied. There, the Supreme Court concluded that the trial court's substantial reason or interest in closing the courtroom was based on security issues, since a physical altercation had occurred the previous day and certain witnesses feared gang retaliation should they testify. *Drummond,* 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, at ¶ 54. *Drummond* also noted a federal case in which concerns for an undercover officer's safety constituted a "substantial reason" to close the courtroom. Id. Thus, in *Drummond* the first *Waller* prong was met.

{¶ 76} As to the second prong, *Drummond* concluded that the closure of the courtroom during the testimony of three state witnesses was no broader than necessary. Of import, however, was the fact that the courtroom was not entirely closed to all spectators. The court found it important that the media was allowed to remain in the courtroom, holding that its presence "helped safeguard [the defendant's] right to a public trial." Id. at ¶ 55.

{¶ 77} As to the third prong, the trial court in *Drummond* did not consider on the record alternatives to closing the courtroom. However, the court held that this could not be seen as error, since the closure was only during three witnesses'

testimony and was narrower than closing the entire trial. 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, at ¶ 57. Again, we note that the closure was also partial in the sense that not all spectators were removed.

{¶ 78} Lastly, the Supreme Court concluded that the trial court's findings that there had been an altercation between spectators and the courtroom deputies in addition to the witnesses' expressed fears were adequate in light of the limited closure of the court. It noted, though, that "the trial court should have made additional findings to clarify the reasons for closing the court." Id. at ¶ 58.

{¶ 79} In *Drummond,* the trial court judge made the following findings:

{¶ 80} " 'The Court: It's come to the attention of the Court that some of the jurors—or witnesses feel threatened by some of the spectators in the court. The Court's making the decision that until we get through the next couple of witnesses I'm going to clear the courtroom. That includes the victim's family, the defendant's family and all other spectators. The Court had two incidents yesterday involving one of the spectators showed total disrespect to the Court in chambers and gave the deputies a very hard time. I didn't hold him in contempt of court, but just after that then another individual—there was a physical altercation between that individual who also came to watch the trial. * * *

{¶ 81} " * * *

{¶ 82} "The Court: Who ultimately got charged with assault on a peace officer. So over the objection of the defendant I'm clearing the courtroom just for today only. * * *'" 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, at ¶ 32–34.

{¶ 83} Bearing the above in mind, we now turn to the record in the present case and review the matter applying the *Waller* factors. Unlike the courtroom in *Drummond,* the courtroom was completely cleared during one witness's testimony. Thus, while the entire trial was not closed, and closure was limited to one witness (as opposed to three witnesses, as in *Drummond*), everyone was removed from the courtroom. It appears from the record that no one was allowed to remain. Hence, the courtroom was completely emptied of all spectators during part of the trial, which would have been abundantly apparent to the jurors. While we stop short of calling this the "complete closure" that requires the state to establish an overriding reason to close the courtroom, this matter comes perilously close, based on the facts as presented. Thus, the "substantial reason" for this closure must be readily apparent and supported in the record. It is not.

{¶ 84} Immediately following the court's swearing-in of state's witness, Bobby Kelly, the following exchange occurred:

{¶ 85} "THE COURT: Have a seat. It's been brought to the court's attention that you have some concerns over family members of the defendant?

{¶ 86} " * * *

{¶ 87} "THE WITNESS: Yes, sir. Yes, sir.

{¶ 88} "THE COURT: Your concerns are what, sir?

{¶ 89} "THE WITNESS: That, you know, just being in the courtroom, maybe just—any appearance. I don't feel right when they're in the courtroom.

{¶ 90} "THE COURT: Are you concerned about harm to yourself or what?

{¶ 91} "THE WITNESS: My family. Myself and my family.

{¶ 92} "THE COURT: Okay. That's sufficient enough.

{¶ 93} "[APPELLANT'S COUNSEL]: Your Honor, may we put something on the record? We certainly object.

{¶ 94} " * * *

{¶ 95} "THE COURT: I haven't made even [sic] a ruling yet.

{¶ 96} " * * *

{¶ 97} "[Prosecutor:] Your Honor, I would request that the court be cleared of family members of Ceyanie Dubose. We're not asking the court to clear the press or anybody else and any other interested parties. We've already had one witness who did not appear here yesterday as required and who had to be arrested last night as a material witness. This man has expressed fear of that [Dubose] family. I noticed there were probably anywhere from a dozen to 15 or 18 of them, and I think the sole purpose here is intimidation. This witness has expressed fear for himself and has expressed fear for his family. It's in the court's discretion to bar certain members or certain individuals and I'm requesting the court to do so.

{¶ 98} " * * *

{¶ 99} "THE COURT: Okay. Your objection is noted. It remains discretionary with the court and the court will allow the courtroom to be emptied until such time as this man's testimony is completed. * * *

{¶ 100} " * * *

{¶ 101} "THE COURT: Supplementing the request of the prosecutor, the court has observed some staring and glaring of people in attendance both at the defendant and witnesses testifying in support of the reason to clear the courtroom."

{¶ 102} (Tr. 355–359.) Thereafter, the trial court judge closed the courtroom of "all spectators" during Kelly's testimony only. It was also mentioned by the prosecutor earlier on the record that another state's witness, Wilson Taylor, might have been fearful and that this might have been the reason that he initially

failed to appear to testify. (Tr. 268.) Taylor testified only after being arrested for his initial failure to appear in this case. However, this was mere speculation, and the courtroom was not closed during his testimony.

{¶ 103} As in *Drummond,* the stated reason for the courtroom closure in this case was a concern for a witness's safety and possible intimidation. Kelly appears to indicate that he was afraid of the defendant's family. Thereafter, the prosecutor stressed that appellant had at least 12 to 18 family members in attendance and that Taylor might not have initially appeared based on this same fear. However, as earlier stated, the dialogue as to Taylor is pure speculation, since absolutely no evidence exists on the record to support the claim. Also, the testimony of Kelly, as we can see from the record, is not at all clear on this issue. Kelly said he did not "feel right" having appellant's family members in the courtroom. This is a far stretch from a claim that he was intimidated or threatened. In fact, it was the judge who said that Kelly was "concerned about" possible harm. Kelly never stated this directly. Thus, the record does not reflect a substantial reason for closure based on these vague facts.

{¶ 104} Second, although the courtroom was closed for Kelly's testimony only, the state had sought the exclusion only of appellant's family members. The court responded by excluding all spectators, including the media. Thus, the closure in this case was far broader than necessary to protect any concerns as to Kelly's safety and was not appropriately limited. Therefore, the second *Waller* prong was not satisfied here, either.

{¶ 105} Third, it does not appear as though the trial court considered alternatives to the closing of the courtroom. The trial court could have identified the problem spectators and excluded only them from the courtroom. The trial court could also have allowed the media to stay, as in *Drummond.* It did not. Thus, the third *Waller* factor was also not satisfied.

{¶ 106} Finally, we must assess whether the trial court made findings adequate to support the closure in this case. Again, the court in peremptory fashion noted Kelly's "concerns" and responded with a closure of the courtroom. As earlier discussed, there is no explanation of the witness's claimed fear. In fact, the word "fear" was never uttered by the witness. Instead, Kelly expressed concerns about harm to himself and his family only after prompting by the trial court. The judge then summarily deemed this sufficient with no further questioning about the witness's actual or alleged fears and closed the court to all spectators. Thus, the fourth *Waller* factor was not satisfied.

{¶ 107} Based on the foregoing, the record here does not establish that the *Waller* factors were sufficiently satisfied and that the closure was narrowly drawn to preserve the administration of justice. The closure likely bolstered Kelly's testimony in the jury's eyes and could only have shed negative light on appellant

and his family. In light of the barely sufficient evidence supporting appellant's convictions, as earlier discussed, the error was particularly telling. Accordingly, appellant's first assignment of error has merit.

{¶ 108} Appellant's fourth and final assignment of error alleges:

{¶ 109} "The trial court erred when it denied defendant-appellant Ceyanie Dubose's motion to dismiss based upon speedy trial in violation of the rights guaranteed by the Sixth Amendment to the United States Constitution and Article I, § 10 of the Ohio Constitution. (App. at a–7.)"

{¶ 110} The Sixth Amendment to the United States Constitution provides that an "accused shall enjoy the right to a speedy and public trial." Section 10, Article I of the Ohio Constitution provides a criminal defendant the right to a speedy public trial by an impartial jury. Appellant claims that he was denied his right to a speedy trial and that the trial court should have dismissed the charges against him.

{¶ 111} Ohio's speedy-trial statute must be strictly construed against the state. *State v. Singer* (1977), 50 Ohio St.2d 103, 109, 4 O.O.3d 237, 362 N.E.2d 1216. Further, a defendant establishes a prima facie case for dismissal once the statutory time limit has expired. *State v. Butcher* (1986), 27 Ohio St.3d 28, 30–31, 27 OBR 445, 500 N.E.2d 1368. At that point, the state has the burden to demonstrate any extension of the time limit. Id.

{¶ 112} R.C. 2945.73(B) codifies a criminal defendant's right to a speedy trial and states: "Upon motion made at or prior to the commencement of trial, a person charged with an offense shall be discharged if he is not brought to trial within the time required by sections 2945.71 and 2945.72 of the Revised Code."

{¶ 113} A defendant charged with a felony must be brought to trial within 270 days of his or her arrest. R.C. 2945.71(C)(2). However, "each day during which the accused is held in jail in lieu of bail on the pending charge shall be counted as three days." R.C. 2945.71(E).

{¶ 114} In order to review a speedy-trial case, we must count the number of days that have passed while determining which party is responsible for any delay. *State v. DePue* (1994), 96 Ohio App.3d 513, 516, 645 N.E.2d 745. R.C. 2945.72 provides extensions of speedy-trial time for hearings, and subsection (H) specifically extends an accused's speedy-trial time by "[t]he period of any continuance granted on the accused's own motion, and the period of any reasonable continuance granted other than upon the accused's own motion."

{¶ 115} It is possible that appellant's speedy-trial time expired before he was brought to trial. However, he did not file his motion for discharge until after his

trial counsel specifically waived his speedy-trial rights. Thus, this assigned error lacks merit and is overruled.

{¶ 116} Without analyzing each motion filed on the trial court's docket, we note that appellant's counsel submitted a limited waiver of appellant's speedy-trial rights on March 30, 2004. The trial court judge signed and initialed the limited nature of the waiver, which stated, "Limited—time tolled until next trial date of May 10, [2004]."

{¶ 117} On May 6, 2004, appellant's counsel filed a motion for continuance of appellant's May 10 trial date and filed a time waiver, which stated, "Defendant further wishes to waive his right to a speedy trial pursuant to O.R.C. Sec. 2945.71 et. seq. in conjunction with this motion." This time waiver was not limited in any fashion.

{¶ 118} On May 28, 2004, the same counsel, on appellant's behalf, filed a motion to dismiss based on a violation of appellant's speedy-trial rights. Counsel never attempted to withdraw the earlier speedy-trial waiver. The trial court overruled the motion, finding that appellant's counsel waived his speedy-trial rights as of May 6, 2004, and that this unlimited waiver was valid notwithstanding appellant's apparent failure to consent to the time waiver himself.

{¶ 119} The Ohio Supreme Court has held that "a defendant's right to be brought to trial within the time limits expressed in R.C. 2945.71 may be waived by his counsel for reasons of trial preparation and the defendant is bound by the waiver even though the waiver is executed without his consent." *State v. McBreen* (1978), 54 Ohio St.2d 315, 320, 8 O.O.3d 302, 376 N.E.2d 593; *State v. Taylor*, 98 Ohio St.3d 27, 2002-Ohio-7017, 781 N.E.2d 72, ¶ 33.

{¶ 120} Based on the foregoing, counsel's waiver of appellant's rights was valid, and the trial court did not err in overruling his motion for discharge.

{¶ 121} Appellant's jury trial began on July 18, 2005. During appellant's trial, his newly appointed counsel also sought dismissal on speedy-trial grounds. However, appellant never attempted to withdraw the waiver of speedy-trial time filed before the commencement of his trial. Thus, appellant's speedy-trial rights were not violated, since his prior counsel had effectively waived those rights before any potential error was brought to the trial court's attention. R.C. 2945.73(B).

{¶ 122} Accordingly, this assignment of error lacks merit and is overruled.

{¶ 123} In conclusion, we find that appellant's convictions were supported by sufficient evidence and were not against the manifest weight of the evidence. We also hold that his right to a speedy trial was not violated. However, we have no choice but to find that appellant is entitled to a new trial. The trial court's decision to close the courtroom during a crucial defense witness's testimony was

not established on the record. The court failed to satisfy any of the *Waller* factors, and therefore we reverse the judgment and remand this matter. On remand, the trial court must require specific evidence or testimony on the record establishing the substantial reason for closure. It must also consider less drastic means than the removal of all spectators from the courtroom.

Judgment reversed
and cause remanded.

DONOFRIO, J., concurs.

VUKOVICH, J., dissents.

VUKOVICH, Judge, dissenting.

{¶ 124} I dissent from the decision to remand for a new trial. I do not believe that the trial court abused its discretion in ordering the trial closed to spectators for the testimony of Bobby Kelly. See *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 58 (using abuse-of-discretion standard of review in such a case).

{¶ 125} The right to a public trial is important; however, it is not absolute. Id. at ¶ 51. At times, it must yield to interests that are essential to justice and to the practicality that a trial court has the discretion to impose certain controls over its courtroom. Id. In reviewing the trial court's closure decision, we must view all of the facts and circumstances existing in the record of the case. In doing so, I would conclude that the four *Waller* factors have been sufficiently met here.

{¶ 126} First, the state possessed and voiced a substantial interest that was likely to be prejudiced.[1] The record establishes that Kelly asked a deputy to call the prosecutor out of the courtroom in order to express his fear of testifying. An off-the-record discussion was then held with the court. It can easily be discerned that the witness expressed concerns over appellant's family members and that he was concerned about harm to himself and to his family. (Tr. 355–356.) When returning to the record, the witness answered affirmatively to the court's questions on these topics and added that he did not feel right when appellant's family was in the courtroom.

{¶ 127} Contrary to the implications of the majority opinion, whether the trial court's questioning was leading is irrelevant. The court was permitted to facilitate its investigation in that manner so as to expeditiously delve into the matters previously disclosed in the off-the-record discussion. In fact, the witness

---

1. Appellant's reply brief concedes the applicability of the substantial interest test here rather than the overriding-interest test.

articulating his fear on the record is not even a requirement in these situations, let alone eloquently expressing his fear.

{¶ 128} The state requested clearing the courtroom of appellant's family in order to ensure Kelly's cooperation and to appease his fears of appellant's family. As background and context, it must be remembered that appellant's cousin is a murder codefendant with a severed trial and that testimony established that appellant's other family members sheltered him after the murder and even assisted him in cleaning blood from his clothes after the murder. The state opined that between 12 and 18 family members appeared to be present for the sole purpose of witness intimidation. (Tr. 357.)

{¶ 129} The state also noted that the prior witness, William Taylor, had to be detained as a material witness due to his similar fear of appellant's family. (Tr. 356–357.) In fact, the court had been informed earlier in the trial that a material-witness warrant had been filed regarding Taylor, he failed to appear to testify against appellant due to his fear, and he contacted the task force to express that fear. (Tr. 267–268.)

{¶ 130} Considering all of these circumstances, the state advanced a substantial interest likely to be prejudiced by allowing appellant's family to remain in court. That is, the state has a substantial interest in ensuring honest, unfettered testimony from witnesses who should not have to fear a defendant's free family members who are attempting to intimidate witnesses and their families during the witnesses' testimony.

{¶ 131} Here, the court itself had even noticed staring and glaring by the family members at witnesses. (Tr. 358–359.) See *United States v. Brazel* (C.A.11, 1997), 102 F.3d 1120 (addressing "fixed stares" as an attempt to influence testimony). The Supreme Court has acknowledged that fear of retaliation expressed by a witness and the need to protect witnesses against gang violence are important considerations. *Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038 at ¶ 54. And there is a substantial interest in maintaining courtroom security, order, and decorum. Id. at ¶ 58.

{¶ 132} As for part two of the test, I conclude that the court's closure here could be considered no broader than necessary to protect the state's interests. That is, the courtroom was closed for the testimony of only one witness, Kelly. This witness's testimony occupies less than 20 pages in the transcript. (Tr. 359–377.) Furthermore, Kelly's testimony incriminated appellant's cousin (as Kelly was present while the cousin washed blood from the outside of his car door), but his testimony did not directly incriminate appellant. Cf. id. at ¶ 282 (where the *Drummond* dissent lamented that the closure was not as limited as the *Drummond* majority suggested because key prosecution testimony was presented while the courtroom was closed).

{¶ 133} The majority notes that the court closed the courtroom to all spectators when the state sought exclusion only of appellant's family. In further support of the courtroom-security consideration, the trial court noted that some spectators had been staring and glaring at appellant as well. Thus, tension appears to have been building on both sides of the courtroom, and the brief exclusion of spectators from more than just appellant's family can be considered more warranted than in a case without those facts. Additionally, under the totality of the circumstances existing herein, the court could have reasonably feared that the practice of excluding only appellant's family would have prejudiced the defendant even more in the eyes of the jury than the order excluding everyone. That is, the jury could have drawn prejudicial conclusions from exclusion of *only* appellant's family, who had been so prevalent in the courtroom. Thus, contrary to the majority's assumption, I do not believe that this closure "likely bolstered Kelly's testimony in the jury's eyes and could only have shed negative light on appellant and his family."

{¶ 134} This ties into the third part of the test: whether the court considered reasonable alternatives. The court heard concerns off the record, held a recorded hearing on the matter, listened to the arguments of the prosecution and the defense, and questioned the witness. Since the state requested that only appellant's family be excluded and specifically stated that other people and the media could remain, it is clear that the court in fact considered and rejected these alternatives.[2]

{¶ 135} Finally, I conclude that the trial court made findings adequate to support the closure of trial during only the brief testimony of this one witness, whose testimony did not directly incriminate appellant. The trial court questioned the witness on the record, which is not even a requirement under *Waller*, but which provides further support for the trial court's decision. The trial court found that the witness expressed a sufficient fear of testifying in front of appellant's family. (Tr. 356.) It is the trial court's province to judge this witness's demeanor, voice inflection, and gestures and to determine the credibility of the witness's state of fear for himself and his family.

{¶ 136} Moreover, the trial court agreed with the prosecutor's intimidation arguments and supplemented those averments by revealing its observation of courtroom spectators staring and glaring at the defendant and at the witnesses testifying. (Tr. 358–359.) The trial court also occupied the best position to

---

**2.** As for the media, their presence or lack thereof seems unclear from the record. However, in the absence of a prosecution's attempt to correct or supplement the record under App.R. 9, I am constrained to presume the media was absent, since the court ordered the courtroom "emptied" and the court reporter thereafter typed that "all spectators were excused from the courtroom." (Tr. 358–359.)

evaluate whether intimidation pervaded the atmosphere of the courtroom as it viewed the spectator's demeanor and facial expressions.

{¶ 137} Although the trial court could have gone into more detail, I find that the four *Waller* factors weigh in favor of upholding the trial court's decision to close the courtroom for the testimony of this one witness. See id. at ¶ 58 (employing a balancing analysis). See also *State v. Scott*, 7th Dist. No. 05MA215, 2007-Ohio-6258, 2007 WL 4166246, ¶ 28–29 (upholding a closure even where record did not demonstrate that the trial court considered alternatives to closing the courtroom and even where the trial court could have made more detailed findings). Consequently, I dissent from the decision to grant a new trial, and I would affirm appellant's conviction.

{¶ 138} Lastly, on a different note, I must voice certain other disagreements with the majority opinion. Although prejudice need not be evaluated due to the majority's finding a violation of the right to a public trial (which would be a structural error), the majority still opines that the evidence against appellant was not overwhelming. On this matter, I dissent from the majority's statement at ¶ 107 that the verdict was barely supported by sufficient evidence. Taylor's testimony combined with the corroborating evidence regarding the vehicle's damage matching the curb's damages and added to the neighbors' observations including the order of events provided more than "barely" sufficient evidence.