JOURNAL ENTRY AND OPINION
{¶ 1} Delinquent child-appellant, R.H., appeals from a judgment of the Cuyahoga County Court of Common Pleas, Juvenile Division, adjudicating him delinquent of robbery and assault, and ordering that he be committed to the legal custody of the Ohio Department of Youth Services for a minimum period of one year, not to exceed his twenty-first birthday. For the following reason, we affirm.
 {¶ 2} On April 1, 2007, a complaint was filed against R.H. and co-delinquent, D.J. The complaint against R.H. alleged that he committed robbery, in violation of R.C. 2911.02(A)(2), a felony of the second degree; and assault, in violation of R.C. *Page 3 2903.13(A), a misdemeanor of the first degree, against Edward Boyte and Daniel Kilbane. R.H. entered a denial and the case proceeded to a joint dispositional hearing for R.H. and D.J. on June 4, 2007.
 {¶ 3} On May 31, 2007, R.H. filed a "Motion for Continuance Notice of Alibi." R.H. maintained that he subpoenaed the manager of the Cleveland Public Theater ("CPT") to obtain a list of CPT employees.[1] R.H. alleged that on the date of the crime, he had entered the theater to avoid individuals who were following him. He further alleged that he remained in the theater and conversed with an employee of the theater, but was unaware of the employee's name. As of the date the continuance was filed, the manager had not responded to the subpoena. R.H. maintained that it was "believed that the individuals whom were following defendant were the individuals who committed the within alleged crime." For this reason, R.H. requested additional time.
 {¶ 4} Before the dispositional hearing began, defense counsel informed the court that he had just received the name of the employee from CPT who had spoken to R.H. on the night of the crime. Defense counsel stated that the employee was also on the prosecutor's original witness list supplied to him through discovery.[2] *Page 4 
Defense counsel said the witness was in New Hampshire at the time of the dispositional hearing and thus, he requested a continuance so that he could interview this witness and possibly get her to testify. The trial court denied R.H.'s continuance request.
 {¶ 5} Boyte testified that on March 31, 2007, at approximately 9:40 p.m., he and his partner, Daniel Kilbane, were leaving CPT. As they were crossing Detroit Avenue to go to their car, which was parked in a parking lot across the street from the theater, a group of five teenage males yelled at them from across the street. The group asked Boyte and Kilbane for the time, and then the teens crossed the street and approached the men. Boyte testified that Kilbane told him to get in the car, and one member of the group said, "What, are you afraid something is going to happen?" Kilbane replied, "Yes."
 {¶ 6} Boyte said that he and Kilbane tried to get into their car to leave. At that time, one of the males sat on the trunk of their car. Boyte got into the driver's side of the car, but said that he could not leave because of the male sitting on the trunk. Kilbane got out of the car and told the group that he was calling the police.
 {¶ 7} Boyte stated that he got out of the car, too, and one of the males held his car door open and said, "You can't touch me." Boyte replied that he was not touching him; he just wanted to leave. Boyte testified that he was then surrounded *Page 5 
by three of the young males. The one to Boyte's right punched him in the face. The one to Boyte's left said, "He's got something in his pocket," and then took Boyte's wallet, while one of the other males punched him.
 {¶ 8} Boyte said he was then thrown to the ground, and kicked and punched while he was on the ground. The five males then fled. Boyte and Kilbane called the police. Approximately five minutes later, the police arrived. Boyte testified that he and Kilbane gave a description of "some of the youth[s]" and informed the police which way the group had fled.
 {¶ 9} Boyte said the entire incident lasted approximately three-and-a-half to five minutes. He said that although it was dark, the street was well lit. Boyte further testified that he looked directly at the male who punched him and at the one who took his wallet. The prosecutor asked Boyte if he could describe the individuals, collectively or individually, and Boyte replied:
 {¶ 10} "They were African-American teens, all males, and then two of them, the descriptions I know that we gave were jeans, a stripped [sic] shirt. I believe one had a jacket. I specifically remember none of them had a hat or were wearing a hood or wore sunglasses or anything like that. I would say they're medium height and not heavy, average build." Boyte testified that when he gave the description to the officers, he was "very sure" of his description.
 {¶ 11} Boyte said that after they described the young males to the police officers, the officers went looking for the offenders. Boyte testified that *Page 6 
approximately ten minutes later, the officers came back with two males in the back of the police cruiser. Boyte said the officers opened the police "car door and the car light was on and it was also under a streetlight at Cleveland Public Theater and they held the door open and asked if I recognized the youth[s]. And I remember saying to the officer and meaning it that I'm 100% sure. And I used those words to the police officer that those two were involved in the attack."
 {¶ 12} Boyte stated that he received injuries from the attack. He had contusions on his jaw, sprains and lacerations on his knee, and bruises on his chest.
 {¶ 13} Boyte was asked if any of the inviduals who attacked him were in the courtroom, and he replied "two of them are." Boyte identified D.J. as the young male who had held his car door open and R.H. as the one who took his wallet.
 {¶ 14} On cross-examination, Boyte said that his car was parked about ten feet from the nearest street light. Defense counsel replied that from the pictures, it appeared more like forty or fifty feet, and Boyte stated that he was not sure of the distance. Boyte said that R.H. was wearing jeans and "I believe a stripped [sic] shirt." Boyte further stated that "I believe the other guy was wearing a jacket," which was blue from what he could remember. When further asked about what color the striped shirt was, Boyte replied, "My recollection of the clothes is not as clear as my recollection of their faces and what they looked like. I remember that the other assailant reminded me a little bit of a popular singer Pharrell. And I remember seeing him in the car and thinking that." *Page 7 
 {¶ 15} Kilbane's testimony about the events that occurred essentially corroborated Boyte's, except for the following differences. Kilbane stated that the ages of the young males ranged from approximately 13 to 16, and their heights ranged from approximately 5'2" to 5'10". Kilbane stated that all five males were actively involved in the attack.
 {¶ 16} Kilbane testified that one of the assailants attacked him, but he was able to fend him off. Kilbane said that almost immediately after the first attack, another one of the assailants tried to attack him, but Kilbane punched the second attacker. The two males kicked and punched Kilbane, resulting in a bruise on the back of his leg. At the same time Kilbane was being attacked, the other three males were attacking Boyte.
 {¶ 17} Kilbane stated that when the police came back and had two males in the back of their cruiser, he was able to identify them as two of the five males who attacked them to a "100%" certainty. He then identified D.J. and R.H. in court as two of the individuals who participated in the attack, but stated that they were not the ones who attacked him.
 {¶ 18} On cross-examination, Kilbane was asked what description he had given police officers on the night of the incident. Kilbane stated, "Jeans, t-shirt, jackets." When further asked what colors, Kilbane replied, "I remember that one of them was wearing a green shirt. I don't actually remember all the colors that they *Page 8 
were wearing." When further asked, how he had described the assailants, Kilbane replied, "[t]heir clothes, the short hair, the fact that they were African/American."
 {¶ 19} Kilbane admitted on cross-examination that he would not be able to identify the two young males who attacked him "because it happened so fast." But he said that he could identify the co-delinquents as two of the five males who had attacked him and Boyte that night.
 {¶ 20} Officer Michael Hageman of the Cleveland Police Department was on routine patrol on the night of March 31, 2007.[3] When he arrived at the scene, Boyte and Kilbane stated that "they were just robbed and beaten up by five young black juveniles." Both men were upset and the one was injured.
 {¶ 21} Officer Hageman said that the victims gave several descriptions of their assailants, including that "they were all black males in their teens." The victims also said that one was wearing "a tan coat and blue jeans and the other one had a black coat and jeans and I think a stripped [sic] shirt."
 {¶ 22} The victims told the officers which direction the attackers had gone and the officers immediately "just started touring the area." Officer Hageman said, "[w]e located two males fitting the description on 65th and I believe Bridge." When asked how the males matched the description, Officer Hageman said, "[i]t was almost exact, I guess. I mean, tan coat and blue jeans and black coat, jeans." *Page 9 
 {¶ 23} When they stopped the two males, the officers asked them where they had been; the young men denied ever being on Detroit Avenue. The officers then took the two males to the scene of the crime. When they arrived, Officer Hageman said that they did not say anything to the victims, but when the victims saw the two males in the back of the police car, they became "excited" and said "that was them for sure." Officer Hageman stated, "right off the bat they were saying that that was them. As we exited the car." Officer Hageman said that approximately ten minutes passed from the time he and his partner had originally arrived at the scene until the time they returned with the two young males.
 {¶ 24} Officer Hageman testified that although the young males first denied ever being on Detroit Avenue, one of them admitted later that he gone into the theater earlier that night to ask a question.
 {¶ 25} On cross-examination, Officer Hageman said that the victims described their attackers by "[c]lothing and [as] young black juveniles." Officer Hageman also stated that he did not know if the police were able to ascertain who took Boyte's wallet. He stated that he did not write the report that night, his partner did.
 {¶ 26} The state rested and R.H. did not present any witnesses in his defense.
 {¶ 27} At the close of the dispositional hearing, R.H. orally moved for a continuance. He argued that there was a substantial conflict as to what was testified to and what was written in the police report. Defense counsel stated, "[apparently the officer that took the report indicated that the person that took the wallet was *Page 10 
never located or found, and that goes a long way seeing that my client is being pointed out now as being the person that took the wallet * * *, and now being a little surprised at trial, a little ambushed about who took the actual wallet is a little surprising, and I ask for a continuance to be able to subpoena the police officer to rebut the testimony here today[.]" The trial court denied R.H.'s oral request.
 {¶ 28} The trial court adjudicated R.H. delinquent of both counts of robbery and assault.[4] The trial court committed R.H. to the legal custody of Ohio Department of Youth Services for institutionalization in a secure facility for an indefinite term consisting of a minimum period of one year, not to exceed the age of twenty-one.
 {¶ 29} It is from this judgment that R.H. appeals, raising the following two assignments of error:
 {¶ 30} "[1.] The trial court's finding of delinquency was not supported by sufficient probative evidence and was against the manifest weight of the evidence.
 {¶ 31} "[2.] The trial court abused its discretion in failing to grant a continuance requested by appellant's counsel when the testimony of victims contradicted the police reports and constituted a surprise to the defense."
 {¶ 32} In his first assignment of error, R.H. argues that the state did not present sufficient evidence to convict him of robbery and assault, and his convictions were against the manifest weight of the evidence. Although R.H. does not argue *Page 11 
sufficiency and manifest weight separately, this court will address his arguments separately.
 {¶ 33} An appellate court's function in reviewing sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus. "In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law." State v. Thompkins (1997), 78 Ohio St.3d 380, 386. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.Jenks at 273.
 {¶ 34} R.H. was convicted of robbery, in violation of R.C.2911.02(A)(2), and assault, in violation of R.C. 2903.13(A). This court must determine if the state presented sufficient evidence on the elements of each of these crimes.
 {¶ 35} R.C. 2911.02(A)(2) provides: "No person, in attempting or committing a theft offense or in fleeing immediately after the attempt or offense, shall * * * [i]nflict, attempt to inflict, or threaten to inflict physical harm on another."
 {¶ 36} R.C. 2903.13(A) provides: "No person shall knowingly cause or attempt to cause physical harm to another * * *." *Page 12 
 {¶ 37} We begin by noting that a defendant may be convicted of the principal offense if it is established that the defendant acted in complicity with another. State v. Herring (2002), 94 Ohio St.3d 246,251. Complicity has been codified in R.C. 2923.03, which provides, in pertinent part to the instant appeal, that "[n]o person, acting with the kind of culpability required for the commission of an offense, shall * * * [a]id or abet another in committing the offense[.]" R.C. 2923.03(A)(2). The Ohio Supreme Court has dictated the requirements for a conviction of complicity by aiding and abetting:
 {¶ 38} "To support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime." State v.D.J. (2001), 93 Ohio St.3d 240, syllabus.
 {¶ 39} The record in the case at bar reveals that the state presented evidence, through the testimony of Boyte, Kilbane, and a Cleveland police officer, that a group of five teenage males acted in concert when they harassed and assaulted the two victims, physically injured them, and robbed one of them. The two victims testified that as they were leaving Cleveland Public Theater, the group of young males yelled at them from across the street and then approached them, would not let the victims leave in their car, sat on the trunk of their car, held one of the car doors open, *Page 13 
taunted the victims, harrassed them, and then finally punched and kicked both victims and took one of the victim's wallet. Officer Hageman testified that when he arrived, the victims were visibly upset and told him essentially the same version of events they testified to. This was sufficient evidence, if believed, to prove beyond a reasonable doubt that a group of five assisted each other, cooperated with each other, and acted in concert, when attacking and robbing Boyte and Kilbane.
 {¶ 40} Indeed, R.H. does not contend that the evidence was insufficient to show that a group of five males robbed and assaulted the victims, nor does he argue that the state did not present sufficient evidence to show that the group acted in concert. R.H. maintains, however, that the state did not present sufficient evidence to prove that he was actually one of the five males. Specifically, R.H. argues that the victims gave conflicting descriptions to the police officers at the scene, and also during their testimony. We disagree.
 {¶ 41} Officer Hageman testified that after he and his partner received descriptions of the five males, and the vicinity the group fled to, the officers went searching for the group. Officer Hageman testified that when they found R.H. and D.J., their clothing matched the description of two of the young males exactly, both wearing jeans, one wearing a tan coat, and one wearing a black coat. In addition, R.H.'s and D.J.'s age and race also matched the description given by the victims. *Page 14 
 {¶ 42} According to Officer Hageman, he took the two male suspects to the scene of the crime within fifteen minutes of the crime occurring.[5] When the victims, who were still at the scene, saw the two males in the back of the police cruiser, they became very "excited," and identified the two males immediately, telling Officer Hageman that they were positive the two males were part of the five who attacked them. In fact, Boyte testified that he was "100% sure" in his identification and Kilbane stated that he was "100% certain."
 {¶ 43} Boyte also testified that R.H. was actually the one who took his wallet and D.J. was the one who had been holding his car door open when Boyte was trying to close it to leave. Boyte further testified that he had looked directly into R.H.'s and D.J.'s faces when they were surrounding him with the third man.
 {¶ 44} Thus, this court concludes, when viewing the evidence in light most favorable to the prosecution, that sufficient evidence was presented to prove beyond a reasonable doubt that R.H. was one of the five males who acted in concert, and committed assault and robbery against the two victims.
 {¶ 45} With respect to manifest weight of the evidence, inThompkins, the Supreme Court explained:
 {¶ 46} "[although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that *Page 15 
the judgment is against the weight of the evidence. * * * Weight of the evidence concerns `the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the trier of fact that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.' (Emphasis added.) Black's, supra, at 1594.
 {¶ 47} "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a `thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony. * * * The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'." Thompkins, supra, at 387. (Internal citations omitted.)
 {¶ 48} With this standard in mind, it is our view that this was not such an exceptional case that it rose to the high level of "manifest miscarriage of justice." *Page 16 
Although the victims could not remember exactly what the suspects were wearing, both of them immediately, and to a high degree of certainty, testified that they were positive that R.H. and D.J. were two of the five males who attacked them. The trial court, as the factfinder, heard all of the evidence, and concluded that the victim's testimony was credible. The trial court stated: "I've sat in a lot of trials. I've presided over a lot of trials. I've never seen two better witnesses in my entire career." As such, R.H.'s convictions were not against the manifest weight of the evidence.
 {¶ 49} In his second assignment of error, R.H. argues that the trial court abused its discretion when it did not grant his request for a continuance. In this assignment, R.H. raises two issues. First, he argues that the trial court abused its discretion by not granting his oral request for a continuance at the close of the dispositional hearing because there were "substantial conflicts" testified to at trial, that were not in the written police report and thus he maintains, it constituted a "surprise." The second issue R.H. raises deals with his pretrial motion, where he requested a continuance to further investigate his case.
 {¶ 50} `"The grant or denial of a continuance is a matter [that] is entrusted to the broad, sound discretion of the trial judge. An appellate court must not reverse the denial of a continuance unless there has been an abuse of discretion.'" State v. Jones (2001),91 Ohio St.3d 335, 342, quoting State v. Unger (1981), 67 Ohio St.2d 65, 67. "The term `abuse of discretion' connotes more than an error of law or *Page 17 
judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." State v. Adams (1980), 62 Ohio St.2d 151,157. Whether a trial court abuses its discretion by denying a request for a continuance depends on the circumstances in the case, particularly in the reasons presented to the trial judge at the time the request is denied. Unger, supra, at 67.
 {¶ 51} The first issue, that R.H. was surprised by conflicting testimony, is wholly without merit. He argues that the written police report indicated that the person who took Boyte's wallet was never found. Officer Hageman testified that he did not know anything about the wallet, because it was his partner who wrote the report. His partner, Officer Rodriguez, was on the state's original witness list, but did not testify. For this reason, R.H. seems to be arguing, he was taken by surprise by contradictory evidence introduced by the prosecution. We disagree.
 {¶ 52} First, R.H. did not subpoena Officer Rodriguez to testify at trial, nor did he seek to introduce the written police report into evidence. This court cannot speculate as to what it states. Even if he had, and even if Officer Rodriguez had written in the police report that the wallet was never found or that it was not found on R.H., and he testified to the same at trial, it would not affect the outcome of trial court's finding R.H. delinquent of robbery.
 {¶ 53} Boyte testified that it was R.H. who said, "He's got something in his pocket," and testified that R.H. then took his wallet while another male punched him. Merely because the wallet was not found on R.H. does not mean he did not take it. *Page 18 
He could have thrown it away or given it to one of the other males in the group. Therefore, the trial court did not abuse its discretion when it denied R.H.'s oral request for a continuance.
 {¶ 54} With respect to his written motion for a continuance, R.H. argues that the trial court should have granted it so that he could interview a possible alibi witness. R.H.'s defense counsel informed the trial court prior to trial that he had subpoenaed the manager of CPT to produce the theater's employment records to find out who was working on the night in question. R.H.'s defense counsel said to the court: "[t]he manager was not forthcoming with the information. He basically indicated that I was working for the defense and that he would not provide me with the information."
 {¶ 55} Defense counsel issued the subpoena to the manager of the Cleveland Public Theater and commanded the manager to appear at the dispositional hearing and bring with him the names of all of the employees who were working on March 30 and 31, 2007, or "in lieu of appear[ing]" at the hearing, submit the information to the attorney by fax or mail. However, defense counsel did not instruct the manager to submit the information to him prior to the dispositional hearing. If defense counsel had wanted this purported alibi witness to testify at the hearing, he would have needed her name prior to the hearing. Thus, it does not make sense that he subpoenaed the manager to appear on the actual day of the trial with the employees' names. *Page 19 
 {¶ 56} In addition, defense counsel was appointed to this case on April 18, 2007. At the pretrial on April 23, 2007, the trial court set the dispositional hearing for June 4, 2007. Defense counsel had approximately six weeks to subpoena, prepare, and present witnesses for the hearing. There was nothing preventing R.H.'s counsel from investigating the matter himself and discovering who the employee was.
 {¶ 57} Moreover, R.H. requested discovery from the state, including a list of the names and addresses of all witnesses the state intended to call at trial. In accordance with Crim.R. 16(B)(1)(e), the state responded with a list of its witnesses. According to defense counsel, the list included the name and address of the purported alibi witness. This clearly should have put R.H. on notice that this person was a potential witness and had information pertaining to the case.
 {¶ 58} Thus, this court is not persuaded that R.H. did not contribute to the necessity for the delay. Accordingly, the trial court did not abuse its discretion when it denied R.H.'s pretrial request for a continuance, as well as his oral request for a continuance during the trial.
 {¶ 59} R.H.'s two assignments of error are overruled and the judgment of the Cuyahoga County Court of Common Pleas, Juvenile Division, is affirmed.
It is ordered that appellee recover from appellant costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate be sent to said court to carry this judgment into execution. The appellant's adjudication of delinquency having been affirmed, *Page 20 
any bail pending appeal is terminated. Case remanded to the juvenile court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
SEAN C. GALLAGHER, P.J., and CHRISTINE T. MCMONAGLE, J., CONCUR.
[1] On May 15, 2007, R.H. subpoenaed Eric Beres, Manager of CPT, to appear at the June 4, 2007 dispositional hearing and commanded him to bring a list of employees who were working at the theater on March 30-31, 2007. In lieu of appearing at trial, R.H. instructed Beres to either fax or mail him the information, but did not specify by what date he should do so.
[2] Defense counsel did not give the name of the CPT employee. However, in the state's response to R.H.'s request for discovery, the prosecutor's witness list included Officer Hageman, Officer Rodriguez, Edward Boyte, Daniel Kilbane, and Faith Evans.
[3] Although Officer Hageman did not testify to this, other documents and testimony make clear that he was on patrol with Officer Rodriguez that night.
[4] D.J. was also adjudicated delinquent of robbery and assault.
[5] R.H. does not argue that the one-on-one ("cold-stand") identification was unduly suggestive, nor did he move to suppress the identification. Thus, this court will not delve into that issue. *Page 1