[Cite as *State v. Adams*, 2010-Ohio-5404.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                CASE NO. 1-10-03

    v.

DUSHUN R. ADAMS,                O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Allen County Common Pleas Court
Trial Court No. CR2009 0182

**Judgment Affirmed**

Date of Decision: November 8, 2010

APPEARANCES:

    *Michael J. Short* for Appellant

    *Jana E. Emerick* for Appellee

**PRESTON, J.**

{¶1} Defendant-appellant, Dushun R. Adams (hereinafter "Adams") appeals the judgment of conviction and sentence entered against him in the Allen County Court of Common Pleas, following a jury trial in which Adams was found guilty of cultivation of marijuana and possession of marijuana. For the reasons that follow, we affirm.

{¶2} This case involves the discovery of a large scale marijuana growing operation found inside property owned by Adams that had been initially searched for the purposes of locating dogs involved in an alleged dog bite incident. On August 12, 2009, the Allen County Grand Jury returned an indictment charging Adams with one count of illegal cultivation of marijuana in violation of R.C. 2925.04(A)&(C)(5)(d), a felony of the third degree; and one count of possession of marijuana in violation of R.C. 2925.11(A)&(C)(3)(d), a felony of the third degree. The cultivation count also contained two automobile forfeiture specifications.

{¶3} A jury trial commenced on November 2-3, 2009, and following the presentation of evidence by both parties, the jury returned a verdict of guilty as to both counts in the indictment, as well as a finding against Adams on the forfeiture specifications.

{¶4} On December 10, 2009, a sentencing hearing was held, and Adams was ultimately sentenced to four years imprisonment on each count. The sentences were ordered to run concurrently for a total of four years in prison.

{¶5} Adams now appeals and raises the following three assignments of error. We elect to address Adams' assignments of error out of the order in which they were presented in his brief and to address his second and third assignments of error together.

**ASSIGNMENT OF ERROR NO. II**

**THE CONVICTION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

**ASSIGNMENT OF ERROR NO. III**

**THE STATE FAILED TO ADDUCE SUFFICIENT EVIDENCE TO SUPPORT THE VERDICT.**

{¶6} In his second assignment of error, Adams argues that his convictions were against the manifest weight of the evidence, and in his third assignment of error, Adams argues that there was insufficient evidence to support the jury's verdict.

{¶7} Reviewing a challenge to the sufficiency of the evidence requires this Court to examine the evidence in the light most favorable to the prosecution. The Ohio Supreme Court has set forth the sufficiency of the evidence test as follows:

> **[A]n appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial and determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.**

*State v. Jenks* (1991), 61 Ohio St.3d 259, 259, 574 N.E.2d 492, paragraph two of the syllabus.

{¶8} Unlike our review of the sufficiency of the evidence, an appellate court's function when reviewing the manifest weight of the evidence is to determine whether the greater amount of credible evidence supports the verdict. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541. In reviewing whether the trial court's judgment was against the manifest weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the conflicting testimony. Id. In doing so, this Court must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the factfinder "'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Andrews*, 3d Dist. No. 1-05-70, 2006-Ohio-3764, ¶30, quoting *Thompkins,* 78 Ohio St.3d at 387, citing *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717.

{¶9} In this particular case, Adams was charged with cultivation of marijuana, and pursuant to R.C. 2925.04(A)&(C)(5)(d), the State was required to prove that Adams knowingly cultivated marijuana, and that the weight of the marijuana equaled or exceeded one thousand grams but was less than five thousand grams. "Cultivation" includes planting, watering, fertilizing, or tilling. R.C. 2925.01(F). Adams was also charged with possession of marijuana. In order to prove possession of marijuana, the State had to show that Adams knowingly possessed marijuana, and that the weight of the marijuana equaled or exceeded one thousand grams but was less than five thousand grams. R.C. 2925.11(A)&(C)(3)(d). "Possession" means "having control over a thing or substance, but may not be inferred solely from mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is found." R.C. 2925.01(K).

{¶10} At trial, the State presented testimony from three law enforcement officers. The first witness was Matthew Durkee, a deputy with the Allen County Dog Warden's office. He testified that, on May 18, 2009, he responded to the 800 block of Oak Street, Lima, Ohio to follow-up on a report that a child had been bitten by a dog. (Nov. 2, 2009 Tr. at 205-06). The purpose of his investigation was to locate the offending dog and quarantine it. (Id. at 206). During his investigation, he came in contact with Adams at 817 Oak Street, who told him that

the dogs Durkee was looking for belonged to Corey James, but Adams could not tell him where James lived, other than he was from Fort Wayne. (Id. at 211). At that point, Durkee told Adams to contact James and inform him that he needed to bring the dogs over to the office for quarantine by the health department. (Id. at 212). After his conversation with Adams, Durkee said that he was suspicious of Adams, so he ran the license plate number on Adams' white Cadillac in the driveway; it came back as being registered to 114 West Vine Street. (Id.). Consequently, Durkee went over to 114 West Vine Street, and while he did not receive any answer after knocking at the door, Durkee said that he could hear at least two dogs barking inside the house. (Id. at 212-13). In addition, Durkee noticed a purple Dodge Intrepid parked out back on the property, which after running that license plate in the system, also came back as being registered to Adams at the 114 West Vine Street address. (Id. at 213). Durkee also checked with the Allen County Auditor's office, and discovered that Adams owned the property at 114 West Vine Street. (Id. at 213-14).

{¶11} The next day, Durkee returned to 817 Oak Street to talk to Adams about whether the dogs had been returned. (Id. at 215). Adams informed him that he had spoken to James who had told Adams that the dog that had bitten the victim had been taken back to Fort Wayne and had subsequently died after eating rat poison. (Id. at 215). Adams also told Durkee that James had called from a

restricted number, and that he did not know how to contact James. (Id. at 215-16). Consequently, Durkee had Adams write out a statement of his conversation with James. (Id. at 216-17); (State's Ex. 5). However, before Durkee left, he asked Adams whether he owned any property in the area of Vine and Main Street and whether he owned any dogs. (Id. at 217). Adams denied owning any property at that location and denied owning any dogs. (Id.).

{¶12} Based on all of the information Durkee had collected and knowing that Adams was not being truthful with him, Durkee obtained a search warrant for 114 West Vine Street for the purpose of looking for and detaining the animal involved in the dog bite incident. (Id. at 218). Durkee then returned to 114 West Vine Street, along with additional officers, to execute the search warrant. (Id. at 220). At that time, Adams arrived at the Vine Street house driving a white Cadillac and asked what was going on. (Id.). Durkee explained to Adams that they had a search warrant for the Vine Street property to look for any animals that had been involved in the dog bite incident. (Id.).

{¶13} At that point, Adams offered to let the officers into the house. (Id.). Durkee said that he followed Adams to a side door of the house, watched Adams open the door with one of his keys and enter the house, quickly shutting the door behind him and leaving Durkee standing outside. (Id. at 221-22). After a few moments, Adams opened another door, on the back side of the house, and told the

officers that they could come in. (Id. at 222). Durkee stated that directly inside the back door were three cages and two pit bulls. (Id.). Adams then informed the officers that one of the pit bulls belonged to him and that it had been the one involved in the attack. (Id. at 223). Adams said that he had hidden the dog at the Vine Street property because he was afraid the dog would be euthanized. (Id.). Consequently, Adams was arrested for obstruction and placed in the back of one of the police cruisers. (Id.). Durkee said that because there were three cages but they had only found two pit bulls, Durkee informed Adams that they were going to continue searching the property for any additional animals. (Id. at 224). Upon being told that they would be continuing the search, Durkee said that Adams' demeanor changed and he became "visibly upset." (Id. at 224-25).

{¶14} While the officers began checking the rest of the house, Durkee said that he went upstairs and, after entering into the first bedroom upstairs, Durkee immediately observed what appeared to be marijuana growing. (Id. at 226-27). At that point, Durkee terminated the remainder of his search and notified the local narcotics unit of his discovery so that another search warrant could be obtained to search the premises for drugs. (Id. at 227-28). Narcotics officers soon responded to the property and subsequently took over the investigation. (Id. at 227-28).

{¶15} Next, Investigator Brian McKinney, a deputy with the Allen County Sheriff's office, and who was currently assigned to the West Central Ohio Crime

Task Force (a multi-jurisdictional drug task force), testified. He stated that on May 19, 2009, he was contacted by the dog warden's office regarding the discovery of marijuana when conducting a search warrant to look for dogs. (Id. at 237-389). As a result of his conversation, McKinney obtained a warrant to search 114 West Vine Street for evidence of illegal drugs and went out to the property with a few other narcotics investigators to execute the search warrant. (Id. at 239-41). McKinney entered the house through the back door where the dogs had been found, and immediately noticed that the house was "in very, very, very bad shape." (Id. at 241-42). At trial, McKinney elaborated further on the deplorable conditions of the house and presented several photographs which he had taken that day that documented the conditions of the house. (Id. at 242-47). When he reached the upstairs, McKinney said that the windows in both of the bedrooms were covered in black plastic. (Id. at 248). In addition, both bedroom walls were completely covered with a foil-type reflective material, which McKinney explained helped keep and reflect the heat in the rooms, thereby helping the plants grow. (Id. at 249). Moreover, several homemade grow lights and related accessories were found in both of the bedrooms, along with approximately sixty marijuana plants, all of which were in various stages of growth. (Id. at 249-61). The officers also found upstairs potting soil, fans, a heater, and other items commonly used in marijuana growing operations. (Id. at 263-65). McKinney

testified that all of the plants that they seized from the house were later tested and weighed, and it was conclusively determined that the plants were marijuana and in total weighed approximately 4,688.8 grams.  (Id. at 265-67); (State's Ex. 4).

{¶16} On cross-examination, McKinney acknowledged that during their search they had found an electric bill in a Corey James' name for that particular property.  (Id. at 270).  McKinney put Corey James' name in a database that searched persons who have Ohio licenses plates, car registrations, or driver's licenses, but was unable to find anything about James. (Id.).  However, McKinney stated that he did not spend a lot of time investigating Corey James because he did not think that it was very significant. (Id.).

{¶17} Last to testify for the State was Andrew Johnson, an officer with the Lima Police Department and who was also assigned to the West Central Ohio Crime Task Force.  Johnston stated that he had been at 114 West Vine Street on May 19, 2009, and had helped gather evidence at the property.  (Id. at 276-80).  In addition to the evidence collected upstairs, Johnson testified that he discovered marijuana downstairs in the kitchen of the Vine Street residence, and he discovered mail addressed to Adams at the 114 West Vine Street residence inside one of the drawers in the living room.  (Id. at 282, 298).  With respect to the growing operation, Johnson explained that marijuana plants need light and a lot of water to grow.  (Id. at 294-97).  Regarding the light, Johnson said that someone

had hung homemade artificial grow lights from the ceiling above the plants, and in order to keep the plants warm inside the house and to reflect the light from the homemade grow lights, someone had also covered all of the walls in bedrooms with mylar, a foil-type material, which surrounded all of the growing marijuana plants. (Id. at 294-95). With respect to watering the plants, Johnson explained there was no running water in the house, but that it had looked like someone had been bringing water into the house, because they found several empty water jugs all over the house and in the bedrooms where the marijuana plants were growing. (Id. at 296-97).

{¶18} In addition to the house, Johnson said that they searched two of Adams' vehicles, an Intrepid and a Cadillac, both of which were registered to 114 West Vine Street. (Id. at 303). The Intrepid was parked directly behind the Vine Street residence, and inside the vehicle's trunk, officers found a foil panel with a hole drilled into the middle of it, similar to the foil panels used upstairs in the house around the homemade grow lights. (Id. at 303-04). Johnson testified that they also found boxes containing empty water bottles, small pieces of mylar/foil with duct tape on them, and some spare electrical wire inside the trunk of the Cadillac. (Id. at 304-05). Not only did the officers find thirteen empty jugs inside the trunk of the Cadillac, but the name on the empty water jugs found inside Adams' Cadillac was the same name as the empty jugs found inside the house.

(Id.). Moreover, the pieces of aluminum foil with duct tape on them were very similar to the pieces of foil that were found inside the house that were covering all of the walls in the upstairs bedrooms and surrounding the growing marijuana plants. (Id. at 306). Overall, Johnson said that given the size and number of the plants found inside the Vine Street house, the marijuana growing operation had been going on for several months. (Id. at 302).

{¶19} After admitting all of its exhibits, the State rested, and the defense presented its case. The defense first called Heather Jenkins to testify. Jenkins testified that she had been a regular babysitter for Adams' youngest child for approximately a year, including the early part of 2009. (Id. at 330-37). She said that she knew Adams had rented his house on Vine Street to a person named Corey James, and that on one occasion, she had accompanied Adams to the Vine Street property, where she saw Adams pick up a garbage bag and a box full of empty water jugs outside the front of the house. (Id. at 332-34). In addition, Jenkins said that sometime around the third week of April 2009, she had driven James to Wal-Mart, where she said she saw him purchase dog food and ten to fifteen jugs of water. (Id. at 336-37).

{¶20} Next, Shannon James (not related to Corey James)(hereinafter "Shannon") testified that she was Adams' girlfriend and the mother of one of his children, and that although they had broken up and were living apart in May of

2009, they were now together and she was currently living at 817 Oak Street. (Id. at 348-49). Shannon explained that she and Adams had purchased the Vine Street property together several years ago, and that they had lived there for a short period of time until they eventually moved out because the property had become not habitable. (Id. at 348-52). After they moved out of the house, the house was rented to family members, and then in May of 2009, she said that the house was being occupied by Corey James. (Id. at 353).

{¶21} Adams then took the stand and testified that while he and Shannon owned the property at 114 West Vine Street, he lived in a rental property at 817 Oak Street. (Nov. 3, 2009 Tr. at 375-78). Adams said that he and Shannon had lived at the West Vine Street address for about seven years but moved out when the roof started to leak. (Id. at 380-81). Adams explained that because he moved around after leaving the house, he decided to leave the West Vine Street address as his mailing address and as the address for his automobile registrations. (Id. at 386). He further stated that when they had moved out of the house, he had left a lot of paperwork behind at the house. (Id. at 388). As far as the Intrepid was concerned, Adams explained that he had left the car in the back of the Vine Street house because it did not run properly, and he had decided to leave it there until he could get around to fixing it. (Id. at 407).

{¶22} After moving out of the Vine Street house, Adams said that they rented the house to some family members, and ultimately he let one of his friends, Corey James, rent the house from him. (Id. at 383); (Defendant's Ex. A). Adams said that in exchange for letting James only pay $100.00 a month in rent, James was supposed to be fixing the roof at the property, so Adams could eventually fix the inside of the house. (Id. at 384). Adams stated by May 18, 2009, that James had been living at the West Vine Street address for about a year, along with his dogs. (Id.). Adams said that he was aware that there was no running water at the Vine Street house, and that occasionally James would come by Adams' place on Oak Street to take baths. (Id. at 404). Adams testified that he rarely went inside the Vine Street house, and only went over to the property to pick up the trash since the city did not provide a garbage service at the residence. (Id. at 405).

{¶23} Adams further explained that he had been dog sitting for James when the bite incident occurred. (Id. at 393). Adams had been there when the little girl had been bitten by one of James' dogs, but Adams said that he only saw a few scratches on her so he did not think very much of the incident until the dog warden came by a few days later asking about the incident. (Id. at 394). By that time, James had already picked up the dogs, and Adams said that he had told the dog warden that the dogs belonged to James, and also informed the dog warden that James was staying at a house Adams owned at West Vine Street. (Id. at 394-

97). In addition, Adams said that he had told the dog warden that he only had James' cell phone number, but that he usually just went over to the Vine Street property if he ever needed to contact James. (Id. at 424).

{¶24} With respect to the items found in his Cadillac, Adams said that, about a week before the search at the residence, he had picked up a few empty bottles at the Vine Street property and put them in the back of his Cadillac but had never got around to taking them out of the trunk. (Id. at 406). As far as the foil panel and other items found in his Intrepid, Adams denied having anything to do with putting those items in that vehicle. (Id. at 404-09). Furthermore, Adams denied telling the officers that any of the dogs belonged to him. (Id. at 392-96). Finally, while Adams acknowledged that he had two prior felony convictions for possession of cocaine and having a weapon while under disability, he denied having anything to do with the growing operation of marijuana in the Vine Street residence. (Id. at 409).

{¶25} Finally, Tia Johnson testified for the defense. She explained that she and James used to be together, and that she met Adams through James. (Id. at 441). She stated that in May of 2009, James was staying at the Vine Street house and that he had two dogs living with him. (Id. at 442-45). Tia said that, for whatever reason, James would not let her go upstairs at the Vine Street house in April and May of 2009. (Id. at 449). In addition, she said that, around May 13,

2009, she and James went to Indiana for several days to visit some of his family and that Adams agreed to watch James' dogs while they were out of town. (Id. at 446). Nevertheless, she testified that she never saw James again after they returned from Indiana on May 17, 2009. (Id. at 444-49).

{¶26} After the defense rested, the State called Investigator McKinney on rebuttal. Investigator McKinney said that he had spoken to Shannon during his investigation at the Oak Street residence. (Id. at 465-66). Despite her testimony that she was staying with Adams at the Oak Street residence, Investigator McKinney said that during their conversation she had given him the impression that Adams was staying with her at the Oak Street address. (Id.). Investigator McKinney explained that he believed based on their conversation that Adams would only stay with her at the Oak Street residence when they were seeing each other, otherwise Shannon had told him Adams would either stay at a friend's house or occasionally stay at the Vine Street residence when they were not seeing one another. (Id.). After the State's rebuttal, each side gave closing arguments, and ultimately the jury found Adams guilty of cultivation of marijuana and possession of marijuana.

{¶27} Now on appeal, Adams claims that based on the evidence presented at trial, no rational trier of fact could have found that the State had produced

sufficient evidence on each element of either the cultivation or possession charges. We disagree.

**{¶28}** Although the State did not elicit any direct testimony that Adams engaged in cultivation and possession of marijuana, circumstantial evidence allowed for the reasonable inference that he at least watered the marijuana and had control over the marijuana. Circumstantial evidence has the same probative value as direct evidence. See *Jenks*, 61 Ohio St.3d 259, paragraph one of the syllabus. Further, "if the State relies on circumstantial evidence to prove any essential element of an offense, it is not necessary for 'such evidence to be irreconcilable with any reasonable theory of innocence in order to support a conviction.'" *State v. Tran*, 9th Dist. No. 22911, 2006-Ohio-4349, ¶13, quoting *State v. Daniels* (June 3, 1998), 9th Dist. No. 19761, at *2 (internal quotations omitted).

**{¶29}** Here, the State introduced evidence that Adams owned the house at 114 West Vine Street and that, despite him not living at that address, Adams still was using the address as his mailing address and his vehicle registration's address. Additionally, Adams was keeping one of his vehicles on the property, which contained items similar to the cultivation items found upstairs in the house. Moreover, there was evidence that when approached by the dog warden on May 18, 2009, about the possibility of dogs living at the Vine Street house, Adams lied and denied any knowledge of such dogs. The State also presented evidence that

Adams lied again to the dog warden when he also denied owning the Vine Street property. Despite having denied owning the property to the dog warden, Adams just happened to stop by the house right before the dog warden executed the search warrant on the Vine Street residence, and used one of his keys to open the house for the officers. Instead of allowing the dog warden to come inside, Adams quickly shut the door behind him and opened another door for the dog warden, which was right next to the place in the house where the dogs were located. Although Adams did voluntarily let the dog warden and the rest of the officers inside the house, when the dog warden told him they were going to continue to search the remaining parts of the house Adams became visibly upset. Furthermore, the house did not have running water, but officers found water jugs inside the house, which appeared to have been used to water the marijuana plants recently. Importantly, several empty water jugs that bore the same name as the ones found inside the house were found in the trunk of the vehicle that Adams had driven to the property. In addition, several pieces of aluminum foil with duct tape on them, which were very similar to the pieces that were covering the walls in the upstairs bedrooms which were surrounding the marijuana plants growing inside the house, were also discovered in the trunk of Adams' vehicle.

{¶30} Overall, after viewing the evidence in a light most favorable to the State, we believe that a rational trier of fact could have found the essential

elements of the cultivation and possession charges were proven beyond a reasonable doubt.

**{¶31}** With respect to his manifest weight argument, Adams claims that while the State presented a significant amount of evidence indicating that marijuana was being grown at the Vine Street address, the State failed to show that it was Adams who was growing the marijuana or that he was complicit with anyone in the cultivation of the marijuana. Again, we disagree. Despite Adams' arguments to the contrary, there was more evidence than just Adams' owning and having access to the Vine Street property. In addition to him having a key to the property, there was evidence that Adams was currently using the property as his mailing address and his vehicle registration address. Moreover, in light of Investigator McKinney's conversation with Shannon James, it was even questionable whether Adams had been actually staying at the Vine Street residence and not the Oak Street residence. Furthermore, and most importantly, various cultivation materials were found inside the trunks of both of Adams' vehicles.

**{¶32}** Therefore, given the significant amount of circumstantial evidence presented at trial, we cannot find that the jury clearly lost its way or that there was a manifest miscarriage of justice.

**{¶33}** Adams' second and third assignments of error are, therefore, overruled.

## ASSIGNMENT OF ERROR NO. I

**THE TRIAL COURT ERRED IN GIVING A JURY INSTRUCTION ON COMPLICITY.**

**{¶34}** In his first assignment of error, Adams argues that the trial court erred in giving the jury an instruction on complicity. In particular, Adams claims that the State failed to present evidence that Adams had "aided or abetted" in the marijuana cultivation.

**{¶35}** A trial court's decision to give a jury instruction is within its discretion, and we will not reverse such a decision absent an abuse of that discretion. *State v. Lightner*, 3d Dist. No. 6-09-02, 2009-Ohio-4443, ¶11, citing *State v. Guster* (1981), 66 Ohio St.2d 266, 271. An abuse of discretion connotes more than an error of judgment; rather, it implies that the trial court acted unreasonably, arbitrarily, or unconscionably. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 450 N.E.2d 1140. When applying an abuse of discretion standard, a reviewing court may not simply substitute its judgment for that of the trial court. Id.

**{¶36}** "Generally, requested jury instructions should be given if they are a correct statement of the law as applied to the facts of the case." *State v. Johnson*,

6th Dist. No. WD-09-061, 2010-Ohio-3220, ¶35, citing *Murphy v. Carrollton Mfg. Co.* (1991), 61 Ohio St.3d 585, 575 N.E.2d 828. "'[A] court's instructions to the jury should be addressed to the actual issues in the case as posited by the evidence and the pleadings.'" *Johnson*, 2010-Ohio-3220, at ¶35, quoting *State v. Guster* (1981), 66 Ohio St.2d 266, 421 N.E.2d 157.

**{¶37}** R.C. 2923.03(A)(2), the complicity statute, provides: "No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following: * * * (2) Aid or abet another in committing the offense." A person who is complicit in an offense may be charged and punished as if he were the principal offender, and a charge of complicity may be stated under R.C. 2923.03 or in terms of the principal offense. R.C. 2923.03(F). "To support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime." *State v. Johnson*, 93 Ohio St.3d 240, 2001-Ohio-1336, 754 N.E.2d 796, at syllabus; *State v. Wilson*, 2nd Dist. No. 22581, 2009-Ohio-525, ¶27.

**{¶38}** Adams claims that the evidence did not reasonably show that he aided or abetted in the marijuana cultivation. We disagree. There was evidence

that Adams owned the property and still used the property as a mailing address and registration address for his vehicles, despite his claims at trial that he rarely went to the Vine Street property. In addition, there is evidence that indicates Adams was not truthful to law enforcement officers in their investigation on several occasions: concerning his ownership of the Vine Street property, the possible location of the dogs living at the Vine Street property, and his ownership of the dogs involved in the dog bite incident. Furthermore, a piece of the metallic material identical to the ones used in the growing operation was found in the trunk of Adams' Intrepid. Moreover, several empty water jugs, which were the exact same brand as the water jugs found upstairs in the house next to the marijuana, were found inside the trunk of Adams white Cadillac – the car that Adams had driven to the Vine Street property when the dog warden was executing his search warrant. Along with the empty water jugs, several pieces of the same foil-like material, which even had been duct taped in the exact same way as the pieces found near the marijuana plants, were also found inside the trunk of Adams' vehicle.

**{¶39}** Based on all of the above, we believe that there was sufficient evidence presented in this case that Adams, at a minimum, aided and abetted in the cultivation of marijuana. Therefore, we find that the trial court did not abuse its discretion when it instructed the jury on the charge of complicity.

-22-

{¶40} Adams' first assignment of error is, therefore, overruled.

{¶41} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**WILLAMOWSKI, P.J. and ROGERS, J., concur.**

**/jlr**