[Cite as *State v. Brown*, 2019-Ohio-1665.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MIAMI COUNTY**

STATE OF OHIO                          :
                                       :
    Plaintiff-Appellee                 :     Appellate Case No. 2018-CA-16
                                       :
v.                                     :     Trial Court Case No. 2017-CR-345B
                                       :
ERIC B. BROWN                          :     (Criminal Appeal from
                                       :      Common Pleas Court)
    Defendant-Appellant                :
                                       :

. . . . . . . . . . .

O P I N I O N

Rendered on the 3rd day of May, 2019.

. . . . . . . . . . .

PAUL M. WATKINS, Atty. Reg. No. 0090868, Miami County Prosecutor's Office, Miami County Safety Building, 201 West Main Street, Troy, Ohio 45373
    Attorney for Plaintiff-Appellee

TRAVIS KANE, Atty. Reg. No. 0088191, 130 West Second Street, Suite 460, Dayton, Ohio 45402
    Attorney for Defendant-Appellant

. . . . . . . . . . . .

FROELICH, J.

{¶ 1} Eric B. Brown appeals from a judgment that convicted him of felonious assault and discharge of a firearm on or near prohibited premises,[1] both with firearm specifications, and sentenced him to six years in prison. The judgment of the trial court will be affirmed.

### Factual and Procedural Background

{¶ 2} On the morning of May 22, 2017, John Couch was working as a repossession agent, assigned to repossess a 2014 Dodge Ram pickup truck belonging to Lisa Naff, a resident of Miami County. While at Lisa Naff's address, Couch encountered gunfire, which Couch and two other people called 911 to report.

{¶ 3} Deputy Will Roberts of the Miami County Sheriff's Office was dispatched in response to the 911 calls. When he arrived at the scene, Deputy Roberts found Brown, Matthew Naff (Lisa's husband), and three other individuals standing on one side of State Route 571, with Couch standing on the opposite side. Deputy Roberts "started yelling[, ']where are the people with the guns?' " (Tr., Vol. 1, p. 23.) According to Deputy Roberts, Matthew Naff "came up * * * and said that he was out in the back yard at his gun range shooting a 9 mm." (*Id.*, p. 24.) Matthew Naff told the deputy that he (Naff) "was the only one with a gun." (*Id.*, p. 25.) Matthew Naff said that he had "shot two seventeen[-]round magazines of 9mm" with a handgun on his gun range. (*Id.*, p. 35.) However, a search by Roberts yielded no shell casings or other evidence of recent shooting in the area of the gun range. (*Id.*, pp. 35-37.)

{¶ 4} When Deputy Roberts spoke to Couch, Couch gave a conflicting account of

---

[1] R.C. 2923.162 prohibits the discharge of a firearm "on or near prohibited premises"; discharging a firearm "upon or over a public road or highway," as charged in Brown's indictment, is one form of that offense. R.C. 2923.162(A)(3).

events. Roberts then re-questioned Matthew Naff, who related varying "scenarios" of what had occurred. (*Id.*, p. 27.) In one version, Matthew Naff said that he "was out back alone shooting" when he "hear[d] his wife scream," so he came around to the front of the house and encountered Couch. (*Id.*, p. 27.) In another version, Matthew Naff said his wife told him that "somebody was blocking the driveway," leading Matthew Naff to come to the front of the house, where he found Couch. (*Id.*) Another account had Couch standing "close to [the Naffs'] front door," with Matthew Naff's telling Couch "get out of my yard" and then "sho[oting] a round into the ground" when Couch refused to leave. (*Id.*, pp. 27-28.) Thereafter, however, Matthew Naff indicated that Couch had been "by his [Couch's] truck" when Naff fired into the ground. (*Id.*, p. 28.)

**{¶ 5}** Deputy Roberts testified that among Matthew Naff's "stories" were claims that Couch had been "trying to break into" the Naffs' home, and that Couch had "threatened" Matthew Naff if Naff "did not bring out the truck." (*Id.*) Deputy Roberts said that he inspected the front door of the Naffs' residence and found no evidence of attempted forced entry. Roberts identified photographs depicting the condition of the Naffs' front door as Roberts found it.

**{¶ 6}** Subsequent to questioning Matthew Naff, Deputy Roberts interviewed Brown, who lived in a camper on the Naffs' property. Brown initially denied having witnessed the incident. (*Id.*, p. 37.) Upon further questioning, however, Brown told Deputy Roberts that Matthew Naff "did not point the gun at" Couch. (*Id.*) Deputy Roberts testified that Brown at first claimed to have been inside his camper during the incident, but then said he had been "out back shooting" with Matthew Naff. (*Id.*) Asked by Roberts if he and Matthew Naff had been using the same 9 mm, Brown told Roberts that he (Brown) "had

a 22."

{¶ 7} After obtaining a search warrant, Deputy Roberts dug where he saw "ground disturbance" in and around the Naffs' front yard, and recovered four bullets. (*Id.*, p. 39.) Deputy Roberts identified photographs of the locations where he found the bullets. (*Id.*, pp. 40-44.) Other law enforcement officials located three shell casings, including one on the opposite side of the road. (*See* Tr., Vol. II, p. 121-123.) All spent bullets and casings recovered from the scene were of 9 mm caliber. (*See* Tr., Vol. I, pp. 171-174.)

{¶ 8} A Miami County grand jury indicted Brown and Matthew Naff together, initially charging Brown with a single count of felonious assault with a firearm specification. (Doc. #1.) By superseding indictment, however, the charges against Brown were amended to one count of felonious assault in violation of R.C. 2903.11(A)(2), a second-degree felony, and one count of discharging a firearm upon or over a public road or highway in violation of R.C. 2923.162(A)(3)/(C)(2), a third-degree felony, both with firearm specifications. (Doc. #22, Counts 3 and 4.)

{¶ 9} Brown and Matthew Naff waived a jury and proceeded to a joint trial to the court. During that trial, Couch testified that on the morning of the incident, he knocked on the front door of the Naffs' residence but got no response. According to Couch, he went to his tow truck to retrieve a note he intended to leave for Lisa Naff, then returned to the front door and knocked again. Matthew Naff opened the door as Couch was leaving the note. Couch testified he told Matthew Naff that he (Couch) was there to speak to Lisa Naff about the Dodge pickup truck. Matthew Naff said that Lisa was his wife, told Couch to "hold on," and shut the door.

{¶ 10} Couch testified that he still was waiting at the front door when he heard a

gunshot come from the side rear area of the house. As he headed back toward his tow truck, which was parked parallel to the road and extending partly into the Naffs' driveway, Couch saw Matthew Naff come around the side of the house with a handgun. Couch testified that Matthew Naff was firing the gun in Couch's direction while screaming obscenities and threatening to kill Couch. As Couch "zigzagged" through the yard to elude Matthew Naff, he felt a clump of dirt hit his pant leg. Couch then spotted Brown in the driveway, also pointing a gun in Couch's direction.

{¶ 11} Couch testified that he reached his tow truck and tried to open the driver's door, but Matthew Naff already was there and prevented Couch from opening the door. Matthew Naff's gun was pointed directly at Couch, "alternating between my head and chest." (Tr., Vol. II, pp. 20-21.) Couch testified that Brown then fired his weapon from the other side of the truck, distracting Matthew Naff long enough for Couch to run across the road. As Couch was crossing the road, he noticed a car headed toward him come to a stop. Couch testified that Matthew Naff continued to fire his weapon at Couch as Couch was crossing the road, and that Naff crossed the road and fired at least one more round.

{¶ 12} Officer Todd Daley testified that, while employed by the West Milton Police Department on May 22, 2017, he responded to "a mutual aid request" related to a report of shots fired. When officers at the scene were searching for the weapons involved, Brown directed Officer Daly to a .22 caliber Ruger that was wrapped in a towel inside the storage box of a utility trailer on the Naffs' property. In securing the gun, Officer Daly determined that it was loaded, with "[o]ne in the chamber and multiple rounds in the magazine." (Tr., Vol. I, p. 125.) An expert witness from the Miami Valley Regional Crime Laboratory testified that "touch DNA" obtained from the Ruger matched Brown. Another expert from

that lab testified that the Ruger was operable.

{¶ 13} John Hartke testified that he and his wife were driving on State Route 571 when three men ran toward the road. One of the men ran in front of Hartke's car, causing Hartke to stop. The other two men were standing beside the road holding handguns; one of them waved for Hartke to drive on. From his rearview mirror, Hartke saw one of the men fire his gun "horizontal[ly]" as Hartke drove away; the gun "was pointed in the direction of the person that was crossing the road." (Tr., Vol. I, pp. 191,197.) Hartke identified Brown as that shooter. Hartke's wife immediately called 911 to report the incident. Hartke's wife, Mary Jean Hartke, also testified that the two men standing beside the road had their guns pointed "[a]cross the road toward" the third man. (*Id.*, p. 206.)

{¶ 14} Gary Larson, a retired Air Force officer, also testified to witnessing "an aggressive situation" while driving on State Route 571 that day. (*Id.*, p. 212.) He said that through his open car window, he heard a series of gunshots, prompting him to stop as he approached the Naffs' residence. Larson testified that the rounds "sounded different," leading him to believe that "they came potentially from two different weapons." (*Id.*) Larson saw Couch, "with his arms up in a neutral position[,] backing across the road." (*Id.*, p. 213.) Larson then observed a man in a white shirt enter the roadway and fire a gun with his "arm outstretched in [Couch's] direction." (*Id.*) Larson identified Matthew Naff as the person in the white shirt. Larson turned his car around drove a safe distance away to call 911. He heard "two or three additional shots" as he drove away, for a total of five or six shots. (*Id.*, pp. 213, 216.)

{¶ 15} Testifying for the defense, Lisa Naff stated that she heard a knock on her front door as she emerged from the shower. She testified that she opened the door while

wearing a towel, but immediately tried to close it because she did not recognize Couch. According to Lisa Naff, as she attempted to close the door, Couch pushed the door open and entered the home. Lisa Naff then screamed for her husband, who came from the rear of the house to the front. Lisa Naff testified that her husband fired four to six shots[2] into the ground, but did not aim the weapon at Couch. She said that she then went inside to get dressed and did not witness any further interactions.

{¶ 16} On May 24, 2018, the trial court found Brown guilty of both felonious assault with a firearm specification and discharging a firearm on or near prohibited premises with a firearm specification. At sentencing, the court stated that it had concluded that Brown aided and abetted Matthew Naff in committing felonious assault against Couch. The court sentenced Brown to three years for felonious assault plus three years for the related firearm specification, to be served consecutively, and to 24 months for discharging a firearm on or near prohibited premises plus three years for the related firearm specification, with the discharging a firearm sentence to be served concurrently with the felonious assault sentence and the two firearm specification sentences also to be served concurrently.[3]

{¶ 17} Brown appeals from that judgment, raising this single assignment of error: "All counts in the indictment must be reversed because they are against the manifest weight of the evidence."

---

[2] Lisa Naff testified that her husband fired two bursts of two to three shots. (*See* Tr., Vol. II, p. 130.)

[3] This court previously affirmed Matthew Naff's convictions of the same offenses arising from the same incident. *See State v. Naff*, 2d Dist. Miami No. 2018-CA-15, 2019-Ohio-1261.

## *Standard of Review*

**{¶ 18}** "[A] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 12; *see Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 19 (" 'manifest weight of the evidence' refers to a greater amount of credible evidence and relates to persuasion"). When evaluating whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

**{¶ 19}** Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997). The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. *Wilson* at ¶ 14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

## *Law Concerning Felonious Assault*

**{¶ 20}** Under R.C. 2903.11(A)(2), "[n]o person shall knowingly * * * [c]ause or

attempt to cause physical harm to another * * * by means of a deadly weapon * * *." "Deadly weapon" means any instrument or device capable of inflicting death and designed for use or used as a weapon. R.C. 2923.11(A). "The act of pointing a deadly weapon at another coupled with a threat, which indicates an intention to use such weapon, is sufficient evidence to convict a defendant of" felonious assault. *State v. Green*, 58 Ohio St.3d 239, 569 N.E.2d 1038 (1991), paragraph one of the syllabus.

{¶ 21} R.C. 2923.03 provides that a defendant who joins with another to commit an offense may be charged as a principal offender. *State v. Grissom*, 2d Dist. Montgomery No. 25750, 2014-Ohio-857, ¶ 21; *see also State v. Hancher*, 2d Dist. Montgomery No. 23515, 2010-Ohio-2507, ¶ 5, citing R.C. 2923.03(F) ("A person who is complicit in an offense may be charged and punished as if he were the principal offender, and a charge of complicity may be stated * * * in terms of the principal offense."). " 'To support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal.' " *Hancher* at ¶ 5, quoting *State v. Johnson,* 93 Ohio St.3d 240, 245, 754 N.E.2d 796 (2001); *State v. Wilson,* 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 27. The requisite criminal intent may be inferred from the circumstances of the crime, *id.*, including from "presence, companionship and conduct before and after the offense is committed." *Grissom* at ¶ 21, quoting *Johnson* at 245. "An aider and abettor is 'punished as if he were a principal offender.' " *Id.,* quoting R.C. 2923.03(F).

***Law Concerning Discharging Firearm Upon or Over Public Road***

{¶ 22} Under the R.C. 2923.162 offense of discharging a firearm "on or near prohibited premises," R.C. 2923.162(A)(3) prohibits any person from "[d]ischarg[ing] a firearm upon or over a public road or highway." If a violation of that provision "created a substantial risk of physical harm to any person," the offense is a third-degree felony. R.C. 2923.162(C)(2).

{¶ 23} The lack of physical evidence may not be fatal to a prosecution under R.C. 2923.162(A)(3) and (C)(2). *See State v. Spade*, 8th Dist. Cuyahoga No. 100933, 2015-Ohio-1014, ¶ 65. In *Spade*, the appellate court affirmed the defendant's conviction for discharging a firearm on or near prohibited premises even though no shell casings were recovered from the gun that the defendant allegedly possessed. *Id.* at ¶ 65, 68. The court there recognized that "[t]he act of shooting in an area where individuals are located and in the range of the shooter creates a substantial risk of physical harm" for purposes of R.C. 2923.162(A)(3). *Id.* at ¶ 67. Two witnesses in *Spade* testified that they saw the defendant shooting a firearm, and one of those witnesses also said she saw the defendant fire across a public road, where other people were present. *Id.* at ¶ 66. Based on that evidence, the Eighth District rejected the defendant's challenge to the manifest weight of the evidence, despite some conflicting testimony as to whether the defendant actually had fired his weapon. *Id.* at ¶ 76.

### *Brown's Manifest Weight of the Evidence Challenge*

{¶ 24} We find nothing in the record from which to conclude that the trial court lost its way in weighing the evidence presented. One police witness who investigated the incident testified that Brown admitted to using a .22 that morning on the gun range behind the Naffs' house; another testified that Brown directed that policeman to a hidden .22

handgun, on which Brown's DNA was found. Both Couch and Hartke testified that Brown had a handgun, that he pointed it in Couch's direction, and that Brown fired that gun while Couch was attempting to flee the situation; Hartke testified more specifically that he saw Brown fire a shot "horizontal[ly]" across the roadway in Couch's direction, and Hartke's wife also testified that Brown had his gun pointed across the road toward Couch. Larson testified that the gunfire he heard as he approached the scene sounded as though it was coming from two different weapons. Despite Brown's attempt to inject doubt about Hartke's visual acuity, we must defer to the trial court's apparent assessment of all such testimony as credible.

{¶ 25} Although no .22-caliber bullets or shell casings were recovered following the incident, the lack of that piece of corroborating physical evidence does not necessitate a conclusion that the trial court's finding was against the manifest weight of the evidence. Based upon our review of the record, we conclude that the trial court did not lose its way or create a manifest miscarriage of justice.

{¶ 26} Brown's sole assignment of error is overruled.

### Conclusion

{¶ 27} The judgment of the trial court will be affirmed.

. . . . . . . . . . . . .

WELBAUM, P.J. and TUCKER, J., concur.

Copies sent to:

Paul M. Watkins
Travis Kane
Hon. Stacy M. Wall